[No. AO15397. First Dist., Div. Two. Mar. 26, 1984.]

LESLIE SALT COMPANY, Plaintiff and Respondent, v.
SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT
COMMISSION, Defendant and Appellant;
SAVE SAN FRANCISCO BAY ASSOCIATION,
Intervener and Appellant.

606

608

## COUNSEL

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, Dennis M. Eagan and Kathleen W. Mikkelson, Deputy Attorneys General, for Defendant and Appellant.

E. Clement Shute, Jr., Alletta d'A. Belin and Shute, Mihaly & Weinberger for Intervener and Appellant.

Edgar B. Washburn, Nancy J. Stivers, J. Lynn Lambert and Washburn & Kemp for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—This case presents the question whether the McAteer-Petris Act (Gov. Code, § 66600 et seq.)[1], which created the San Francisco Bay

---

[1] All statutory references herein are to the Government Code unless otherwise indicated.

Conservation and Development Commission (BCDC) and defines its jurisdiction and powers, allows BCDC to hold a landowner responsible for unauthorized bay fill placed on its property by unknown third persons.

*Facts*

The facts are not materially in dispute. Some time between August 11, 1971, and October 4, 1976, fill consisting of several hundred tons of earth, gravel, asphalt, broken concrete and other demolition materials, along with a barge-like structure, was placed on marshy wetlands in the Alviso Slough and adjacent shoreline on parcels located in Santa Clara County owned by respondent Leslie Salt Company (Leslie). These fill activities took place within BCDC permit jurisdiction.[2]

BCDC discovered the fill in December 1979 and initiated administrative enforcement procedures almost immediately. Pursuant to section 66643, BCDC appointed a fact-finding committee, consisting of five of its members, to conduct hearings and receive evidence. Six months later the committee adopted findings and recommendations which it presented to BCDC at its July 17, 1980, meeting. BCDC adopted the committee's findings and recommendations. The findings, as pertinent, may be summarized as follows:

Between August 11, 1971, and October 4, 1976, approximately 19,400 square feet of area on property then and now owned by Leslie were filled with earth and similar fill materials, the major portion of which was placed prior to June 17, 1973. During that same period, a barge-like structure approximately 30 feet by 100 feet was relocated from a portion of property owned by Leslie to an area partly within that parcel and partly on other land.

A permit for such fill or barge relocation was required after September 17, 1965, pursuant to section 66632, subdivision (a), and none had been granted.

The filled area was not licensed by Leslie to anyone at the time the illegal filling occurred, although the adjacent area to the west and south of the filled area was under license to Marshland Development Inc. (Marshland)

---

[2] A permit from BCDC is required for fill placed on land subject to tidal action and within 100 feet of the shoreline band. (Gov. Code, §§ 66610 and 66632.) BCDC has exercised bay jurisdiction over the area since the agency was created in 1965 and shoreline jurisdiction over the area since 1969.

as of January 8, 1974. No evidence was introduced that Leslie placed the fill itself or authorized anyone else to do so.

Employees of Leslie regularly visited salt ponds close to the area of the fill but no reports of filling activity were received by the company. The manager of real property for Leslie was not aware of any fill activity on parcels owned by Leslie until December 1979. Leslie did not as a matter of company policy assume responsibility for policing or regularly inspecting the land in question owned by it.[3]

Gates controlled the entry of unauthorized vehicles and persons onto the adjacent Marshland site; but no gates or fences were maintained by Leslie to control access to the property in question.

No evidence was presented that Leslie had knowledge of the fill activities prior to the BCDC investigation; nor did BCDC expressly find Leslie negligent in failing to prevent the fill. BCDC instead issued a cease and desist order providing, inter alia, that Leslie was to remove the fill material within six months or be subject to penalties of $6,000 for each day in which the violation persisted.[4] BCDC staff calculated that it would cost Leslie $60,500 to remove the fill; but Leslie claimed the correct cost figure was $100,000. Although BCDC expressed an interest in considering mitigation proposals, Leslie declined to submit any.

Thereafter, Leslie filed a petition for writ of mandate in the Santa Clara County Superior Court pursuant to Code of Civil Procedure section 1094.5.[5] By this petition, Leslie sought a writ directing BCDC to set aside the cease and desist order and a stay of the order pending determination of the validity of that administrative order. BCDC stipulated to the stay pend-

---

[3]In a declaration filed with BCDC, James W. Walton, a vice president of Leslie and its land manager, stated as follows: "While Leslie will not knowingly permit any activity on its land that does not conform to the various laws and regulations, Leslie does not as a policy assume the responsibility of acting as the policing agent for the regulations of governmental agencies as they may affect the operations of those entering and using our land whether as lessees, licensees, permittees or trespassers."

[4]No recommendation for restoration of the land or referral to the district attorney for misdemeanor prosecution was made. (See § 66632, subd. (a).)

[5]Any aggrieved party may file with the superior court a petition for writ of mandate for review of the BCDC's cease and desist order pursuant to Code of Civil Procedure section 1094.5. (§ 66639, subd. (a).) "The evidence before the court in any proceeding to review an order of the commission described in subdivision (a) shall consist of the record before the commission, and in cases where it is claimed that the findings are not supported by the evidence, abuse of discretion is established only if the court determines that the findings are *not supported by substantial evidence in the light of the whole record.*" (§ 66639, subd. (b).)

ing the instant appeal. Appellant Save San Francisco Bay Association intervened in the action on the side of BCDC pursuant to stipulation of the parties.

The trial court rendered judgment for Leslie, and issued a peremptory writ directing BCDC to set aside the cease and desist order. The court found that the language of sections 66632 and 66638 was plain, clear and unambiguous and required "the person who places the fill to obtain a permit or the person who violates the statute to suffer the consequences." The court ruled that the McAteer-Petris Act "does not contain any authority for BCDC to issue a cease and desist order against a person other than one who actually placed the fill upon Leslie's land." In the absence of evidence that Leslie placed the fill or authorized others to do so, there was "not substantial evidence in light of the whole record to support BCDC's issuance of [the] Cease and Desist Order No. CCD5-79(A)." BCDC and Save San Francisco Bay Association thereafter filed this appeal.

■ Where, as here, the facts are not in significant dispute, we are not bound by the trial court's conclusions of law but must independently ascertain the conclusion that must properly be drawn from the pertinent facts set forth in the record. (*People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543 [72 Cal.Rptr. 790, 446 P.2d 790], and cases there cited.)

Our conclusion that the McAteer-Petris Act does provide authority for BCDC to issue the subject cease and desist order, and that the trial court erred, results from a two-part analysis. We first determine that the broad interpretation of the words in question urged by BCDC is consistent with the entire enactment in which those words appear and that the competing interpretation advanced by Leslie is inconsistent with that enactment. We then determine that the exposure to strict liability that results from such broad interpretation is an appropriate traditional consequence of the possession and control of land.

## I.

Section 66632 requires a person or government agency wishing to place fill[6] within the area of BCDC's jurisdiction to secure a permit from the

---

[6]"Fill" is defined in section 66632 as "earth or any other substance or material, including pilings or structures placed on pilings, and structures floating at some or all times and moored for extended periods, such as houseboats and floating docks."

commission.[7] That section further provides that "[a]ny person who places fill . . . within the area of the commission's jurisdiction without securing a permit from the commission as required by this title is guilty of a misdemeanor." (§ 66632, subd. (a).) Section 66638, which is an alternative enforcement device and the one utilized in the instant case, authorizes BCDC to issue cease and desist orders against any person or governmental agency that "has undertaken, or is threatening to undertake, any activity" that requires a permit or is inconsistent with any permit previously issued by the commission.[8]

Section 66640 provides a mechanism whereby the Attorney General may seek an injunction in superior court to restrain any person or persons from continuing any activity in violation of the cease and desist order issued by BCDC. Section 66641 provides that "[a]ny person or governmental agency who intentionally or negligently violates any cease and desist order issued, reissued, or amended by the commission or the executive director may be liable civilly in a sum of not to exceed six thousand dollars ($6,000) for each day in which such violation persists." (§ 66641, subd. (a).) This section also provides that "[r]emedies under this section are in addition to, and do not supersede or limit, any and all other remedies, civil or criminal." (§ 66641, subd. (d).)

Leslie contends that the plain meaning of the McAteer-Petris Act, and particularly section 66638, precludes its application to any person or entity other than the one who actually placed the fill. Leslie's contention that the statute is clear and unambiguous in this respect is built upon its reading of the crucial phrase in section 66638 that BCDC may only issue a cease and desist order against a person or agency that "has undertaken, or is threatening to undertake" any unauthorized fill activity. (§ 66638, subd.

---

[7]Section 66632 provides in relevant part as follows: "(a) During the existence of the San Francisco Bay Conservation and Development Commission, any person or governmental agency wishing to place fill, to extract materials, or to make any substantial change in use of any water, land or structure, within the area of the commission's jurisdiction shall secure a permit from the commission and, if required by law or by ordinance, from any city or county within which any part of such work is to be performed. . . ."

[8]Subdivisions (a) and (b) of section 66638 provide in their entirety as follows: "(a) When the commission, after public hearing, determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing a permit, or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order requiring such person or governmental agency to cease and desist. [¶] (b) Any cease and desist order issued by the commission may be subject to such terms and conditions as the commission may determine are necessary to insure compliance with the provisions of this title, including immediate removal of any fill or other material or the setting of a schedule within which steps must be taken to obtain a permit pursuant to this title."

(a).) Leslie contends, in other words, that the word "undertaken" can only be interpreted to refer to one who actually performs (or threatens to perform) the physical act proscribed. As so construed, Leslie urges, it cannot refer to one who simply does not affirmatively interfere in the unlawful placement of fill by others. Because this language is assertedly so unambiguous, Leslie also maintains that its meaning is not amenable to judicial interpretation.

Leslie heavily and repeatedly relies on the oft-expressed principle that "[w]here the meaning of the statute is plain there is no room or justification for judicial interpretation, and the only function of the court is the application of the enactment to the facts at bar." (*Riley* v. *Robbins* (1934) 1 Cal.2d 285, 287-288 [34 P.2d 715].)[9] This rule is deceptive, however, because it may erroneously be taken to imply that words have intrinsic meanings. In reality "words do not have single, fixed, and immutable meanings established by some authority in nature or supernature, . . . instead, they have only such meanings as are given to them from time to time when they are spoken, written, heard, or read by persons endeavoring to participate in the communication process."[10] (2A Sutherland, Statutory Construction (4th ed. 1973) § 45.01, p. 2; see also § 46.02, p. 51.) In short, whether the words of a statute are clear is a more complicated question than is often supposed by the party who, in reliance upon an asserted "plain meaning," objects to judicial interpretation. Such an objection can never really be sustained for, regardless whether the proposition be judicially acknowledged, it requires interpretation even to agree with the meaning claimed by the objecting party.

---

[9]Leslie calls our attention as well to the following cases, which are to the same effect: *United States* v. *Lexington Mill Co.* (1914) 232 U.S. 399, 409-410 [58 L.Ed. 658, 661-662, 34 S.Ct. 337]; *Holder* v. *Superior Court* (1969) 269 Cal.App.2d 314, 317-318 [74 Cal.Rptr. 853]; *Pepper* v. *Board of Directors* (1958) 162 Cal.App.2d 1, 3, 5 [327 P.2d 928]; *Pac. Gas & E. Co.* v. *Shasta Dam Etc. Dist.* (1955) 135 Cal.App.2d 463, 468 [287 P.2d 841]; and *Copeland* v. *Raub* (1940) 36 Cal.App.2d 441, 445 [97 P.2d 859].

[10]As stated by Justice Frankfurter, with particular reference to statutes: "[U]nlike mathematical symbols, the phrasing of a document, especially a complicated enactment, seldom attains more than approximate precision. If individual words are inexact symbols, with shifting variables, their configuration can hardly achieve invariant meaning or assured definiteness. Apart from the ambiguity inherent in its symbols, a statute suffers from dubieties. It is not an equation or a formula representing a clearly marked process, nor is it an expression of an individual thought to which is imparted the definiteness a single authorship can give. A statute is an instrument of government partaking of its practical purposes but also of its infirmities and limitations, of its awkward and groping efforts." (Frankfurter, *Some Reflections on the Reading of Statutes* (1947) 47 Colum.L.Rev. 527, 528. See also, Radin, *Statutory Interpretation* (1930) 43 Harv.L.Rev. 863, and Landis, *A Note on "Statutory Interpretation"* (1930) 43 Harv.L.Rev. 886.)

The meaning of the words of a statute or, to use the alternative approach favored by many courts, the intent of the Legislature,[11] can only be determined with reference to the context in which the words are used; that is, with reference to such purpose as may be discerned from examining the entire enactment of which the words are part. A statutory phrase may be said to be clear and unambiguous if the meaning assigned to it is not in conflict with other language in the same act. (See *In re Ricky H.* (1981) 30 Cal.3d 176, 187 [178 Cal.Rptr. 324, 636 P.2d 13]; *Wells* v. *Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 788 [176 Cal.Rptr. 104, 632 P.2d 217]; *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]; and *Great Lakes Properties, Inc.* v. *City of El Segundo* (1977) 19 Cal.3d 152, 155-156 [137 Cal.Rptr. 154, 561 P.2d 244]; see also Chief Justice Marshall's opinion in *Sturges* v. *Crowninshield* (1819) 17 U.S. (4 Wheat) 122, 202-203 [4 L.Ed. 529, 550]) for one of the earliest and most comprehensive statements of the principle.) ■ Thus, "in analyzing the legislative usage of certain words, ' "the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration . . . ." ' (*People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543 . . . (hereinafter *Town of Emeryville.*)" (*Blumenfeld* v. *San Francisco Bay Conservation etc. Com.* (1974) 43 Cal.App.3d 50, 55 [117 Cal.Rptr. 327].) The courts resist blind obedience to the putative "plain meaning" of a statutory phrase where literal interpretation would defeat the Legislature's central objective.[12] (*People* ex rel. *Flournoy* v. *Yellow Cab Co.* (1973) 31 Cal.App.3d 41, 45 [106 Cal.Rptr. 874].)

For example, in *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], the Supreme Court was obliged to construe the term "project" in Public Resources Code section

---

[11]This approach was disdained by Holmes, as indicated by his famous dictum that "we do not inquire what the legislature meant; we ask only what the statute means." Holmes, Collected Legal Papers (1920) page 207. See also, Frankfurter, *Some Reflections on the Reading of Statutes, supra,* 47 Colum.L.Rev. at pages 538-540; and *Schwegmann Bros.* v. *Calvert Corp.* (1951) 341 U.S. 384, 395-397 [95 L.Ed. 1035, 1048-1049, 71 S.Ct. 745] (conc. opn. of Jackson, J.).

[12]As stated by Chancellor Kent: "It is an established rule in the exposition of statutes, that the intention of the lawgiver is to be deduced from a view of the whole and of every part of a statute, taken and compared together. The real intention, when accurately ascertained, will always prevail over the literal sense of terms. When the expression in a statute is special or particular, but the reason is general, the expression should be deemed general. . . . and the reason and intention of the lawgiver will control the strict letter of the law, when the latter would lead to palpable injustice, contradiction, and absurdity. . . . When the words are not explicit, the intention is to be collected from the context; from the occasion and necessity of the law, from the mischief felt, and the remedy in view; and the intention is to be taken or presumed, according to what is consonant to reason and good discretion." (1 Kent's Commentaries, p. 462, fns. omitted.)

21151, which requires *local government agencies* to file an environmental impact report "on any project they intend to carry out . . . which may have a significant effect on the environment." In rejecting the contention that, as used in this statute, "project" plainly meant "public works," the court stated at pages 259-260: "Because the legislative intent provisions dictate that we give a broad interpretation to the act's operative language, we begin from that vantage point. Once a particular legislative intent has been ascertained, it must be given effect ' "even though it may not be consistent with the strict letter of the statute." ' (*Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 802 . . . .) ■ As we stated nearly a half century ago in *In re Haines* (1925) 195 Cal. 605, 613 . . .: ' "The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." ' [¶] Our task then is to determine whether the word 'project' is 'sufficiently flexible' so as to effectuate the broad legislative intent that private activities should be brought within the ambit of the act. We may not, of course, give an unreasonable construction to the statute [Citations.]" ■ The *Friends of Mammoth* court also referred to the rule declared in *Town of Emeryville, supra,* 69 Cal.2d 533, 543-544 [72 Cal.Rptr. 790, 446 P.2d 790] that: "A principle 'which must be applied in analyzing the legislative usage of the word "project" [in the McAteer-Petris Act] is that "the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in [the word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is enlarged or restricted and especially in order to avoid absurdity or to prevent injustice." ' " (*Friends of Mammoth, supra,* at p. 260; see also *Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 802 [151 P.2d 505, 157 A.L.R. 324]; *People* v. *Shirokow* (1980) 26 Cal.3d 301, 306-307 [162 Cal.Rptr. 30, 605 P.2d 859]; and *Pennisi* v. *Department of Fish & Game* (1979) 97 Cal.App.3d 268, 273 [158 Cal.Rptr. 683].)

The Legislature's recognition of the importance of San Francisco Bay as a natural resource and the vital role of regulation by BCDC of fill activities both in the bay and along its shoreline is manifest in the act itself and has been judicially reiterated on numerous occasions. (See, e.g., *Blumenfeld* v. *San Francisco Bay Conservation etc. Com., supra,* 43 Cal.App.3d 50, *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557 [89 Cal.Rptr. 897]; *Town of Emeryville, supra,* 69 Cal.2d 533.) In *Town of Emeryville* the Supreme Court perceived that

"[t]he 'objective sought to be achieved' by the McAteer-Petris Act is depicted with remarkable clarity." The court quoted extensively from the legislative findings set forth in the act's opening sections, noting particularly the provisions of section 66601 that stress the "dangers inherent in self-generated and unregulated fill activities." (*Id.,* at p. 544.) In its present form, that section expresses the finding and declaration "that uncoordinated, haphazard filling in San Francisco Bay threatens the bay itself and is therefore inimical to the welfare of both present and future residents of the area surrounding the bay; that while some individual fill projects may be necessary and desirable for the needs of the entire bay region, and while some cities and counties may have prepared detailed master plans for their own bay lands, a governmental mechanism must exist for evaluating individual projects as to their effect on the entire bay; and that further piecemeal filling of the bay may place serious restrictions on navigation in the bay, may destroy the irreplaceable feeding and breeding grounds of fish and wildlife in the bay, may adversely affect the quality of bay waters and even the quality of air in the bay area, and would therefore be harmful to the needs of the present and future population of the bay region."[13] (Gov. Code, § 66601; see also *Town of Emeryville, supra,* at p. 544; and *Candlestick Properties, Inc., supra,* 11 Cal.App.3d at p. 564.)

The Legislature then finds that BCDC has prepared "a comprehensive and enforceable plan for the conservation of the water of the bay and the development of its shoreline, entitled the San Francisco Bay Plan." (§ 66603.) In section 66604 the Legislature empowers BCDC to "issue or deny permits, after public hearings, for any proposed project that involves placing fill . . . within the area of the commission's jurisdiction." In section 66638, as we have earlier described, the Legislature authorizes BCDC to issue cease and desist orders when it determines that "any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing a permit, or (2) is inconsistent with any permit previously issued by the commission . . . ."

■ The courts have consistently interpreted provisions of the McAteer-Petris Act broadly so as to effectuate its purpose of comprehensive regula-

---

[13]The threat the Legislature sought to address by the McAteer-Petris Act was in 1967 alternatively stated by one commentator as follows: "San Francisco Bay has been disappearing at the rate of three and one-half square miles a year. Over the last hundred years, filling and diking have removed over 240 square miles from the Bay. At the present rate, it will take less than one hundred years to deprive the Bay of the 326 miles still susceptible of reclamation." (Comment, *San Francisco Bay: Regional Regulation for its Protection and Development* (1967) 55 Cal.L.Rev. 728, fns. omitted.)

tion of development of the bay and shoreline. (See, e.g., *Town of Emeryville, supra,* 69 Cal.2d 533 [interpretation of "project" in the act's grandfather clause as a word of limitation precluding exemption from the act for certain fill activities by the city]; *Candlestick Properties, Inc., supra* [upholding BCDC authority to deny a request to fill land located within a reclamation district where that land is also within BCDC jurisdiction]; *Blumenfeld* v. *San Francisco Bay Conservation etc. Com., supra,* 43 Cal.App.3d 50 [liberally construing "subject to tidal action" to include property connected to the bay solely by means of a man-made culvert where water reached the property through the culvert occasionally during high tide at certain seasons].)

To deny BCDC the power to enforce the act by issuance of cease and desist orders against landowners whose property contains fill placed there by others in violation of the act would "frustrate the effectiveness of the act" (*Friends of Mammoth* v. *Board of Supervisors, supra,* at p. 263) by materially impairing BCDC's ability to prevent and remedy haphazard and detrimental filling of the Bay. (§ 66601; cf. *People* v. *Shirokow, supra,* at p. 309.) Unless the responsible person were "caught in the act" of placing the fill,[14] or the landowner were proved to have authorized its placement by others, BCDC would be unable to order removal of the fill. Such a narrow rendition of BCDC's authority ascribes no significance to a landowner's ability to prevent the placement of fill on his land by others and, if adopted by the courts, would diminish the incentive for landowners to manage their properties so as to reduce the prospect of illegal fill, a result that is also clearly repugnant to the legislative purpose.

The courts have previously recognized that BCDC "must have the power to regulate *any* proposed project that involves placing fill in the Bay. (Gov. Code, § 66604.)" (*Candlestick Properties, Inc., supra,* at p. 572, italics added.) In our view, BCDC's ability to effectively regulate filling of the Bay requires that its cease and desist power extend to landowners regardless whether they actually placed the fill or know its origin. ■ "It is well settled in this state that governmental officials may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as *may fairly be implied* from the statute granting the powers. [Citations.]" (*Dickey* v. *Raisin Proration Zone No. 1, supra,* at p. 810, italics in original.)

---

[14]The extraordinary difficulty if not the physical impossibility of effective surveillance of BCDC's jurisdiction is manifest from any reasonably accurate map of the shoreline of San Francisco Bay, such as that set forth in Note, *Saving San Francisco Bay: A Case Study in Environmental Legislation* (1971) 23 Stan.L.Rev. 349, at page 354.

■ Accordingly, since we do not consider the words in question to be inflexible, we hold that in order to effectuate the important purpose of the McAteer-Petris Act it is not only reasonable but necessary to construe section 66638 broadly, so that one who "has undertaken, or is threatening to undertake" the proscribed activities refers not simply to one responsible for the actual placement of unauthorized fill but also to one whose property is misused by others for that purpose and who even passively countenances the continued presence of such fill on his land.

## II.

■ Leslie's contention that the broad interpretation we adopt would impose strict liability on landowners without any express legislative direction to do so, while correct, does not dissuade us. Leslie argues that if the Legislature had intended to hold landowners strictly liable for illegal fill and thus subject to possible criminal sanctions under section 66632 and civil fines of up to $6,000 per day for violation of a cease and desist order pursuant to section 66641, the Legislature would have done so explicitly.[15]

Preliminarily, we need not determine whether a landowner in Leslie's position can be held criminally liable for the misdemeanor offense defined in section 66632, subdivision (a), as a "person who places fill" because Leslie was not prosecuted under that statute. The instant action arises out of a cease and desist order issued pursuant to section 66638, subdivision (a), which applies to any person or governmental agency who "has undertaken" activities requiring a permit without first having obtained one. The sanctions for violating section 66638, subdivision (a), are civil in nature: the possible ordering of affirmative action, including fill removal, or civil penalties, or both. (See §§ 66638, subd. (b), 66641.)

■ It needs to be emphasized at this point that the McAteer-Petris Act is the sort of environmental legislation that represents the exercise by government of the traditional power to regulate public nuisances. (*CEEED* v. *California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 318 [118 Cal.Rptr. 315].) Such legislation "constitutes but 'a sensitizing of and refinement of nuisance law.'" (*Id.,* at p. 319.) Where, as here, such legislation does not expressly purport to depart from or alter the common law,

---

[15]BCDC, it may be noted, advances the converse of this proposition; namely, that if the Legislature intended to exempt from liability a landowner which did not itself place the fill it would have done so expressly, as Congress did, for example, in certain provisions of the federal Water Pollution Control Act. (See, e.g., 33 U.S.C. § 1321(f)(2).) Since, as we later explain, strict liability for nuisance historically attends the possession and control of land, the contention of BCDC seems to us to be more forceful than that of Leslie.

it will be construed in light of common law principles bearing upon the same subject. (*People* v. *Curtis* (1969) 70 Cal.2d 347, 352, fn. 2 [74 Cal.Rptr. 713, 450 P.2d 33]; *Estate of Elizalde* (1920) 182 Cal. 427, 433 [188 P. 560]; *Centeno* v. *Roseville Community Hospital* (1979) 107 Cal.App.3d 62, 69 [167 Cal.Rptr. 183]; *Dry Creek Valley Assn., Inc.* v. *Board of Supervisors* (1977) 67 Cal.App.3d 839, 844 [135 Cal.Rptr. 726].)

"At common law public nuisance came to cover a large, miscellaneous and diversified group of minor criminal offenses, all of which involved some interference with the interests of the community at large—interests that were recognized as rights of the general public entitled to protection. . . . In each of these instances the interference with the public right was so unreasonable that it was held to constitute a criminal offense. For the same reason it also constituted a tort." (Rest.2d Torts, § 821B, com. b, p. 88.) ▇▇▇ All that is required to establish that particular conduct constitutes the tort or common law crime of public nuisance is that it interferes with a right common to the general public.[16] However, if specific conduct of this sort is proscribed *by statute*—as clearly it is by the McAteer-Petris Act—then, consistent with the common law rule, one may be held in violation of that statute "even though his interference with the public right was purely accidental and unintentional. . . . There is a clear analogy to the doctrine of negligence as a matter of law, under which a legislative act is taken as laying down a specific rule of conduct that substitutes for the general standard of what a reasonable prudent man would do in like circumstances." (*Id.,* com. e, at p. 90.) Liability, in other words, may be strict. (See also, 58 Am.Jur.2d., Nuisances, § 34, pp. 597-599.)

Under the common law, liability for a public nuisance may result *from the failure to act* as well as from affirmative conduct. Thus, for example, section 839 of the Restatement Second of Torts declares that "A possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land [such as the placement of fill], if the nuisance is otherwise actionable [e.g., prohibited by statute], and [¶] (a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and [¶] (b) he knows or should know that it exists without the consent of those affected by it, and [¶] (c) he has failed after a reasonable opportunity to take reasonable steps to abate

---

[16]And it is noteworthy in this connection that the statutory definition of "nuisance" originally enacted in California in 1872 and still in effect includes "[a]nything which . . . unlawfully obstructs the free passage or use, in the customary manner, of any navigable . . . bay . . ." (Civ. Code, § 3479, italics added.) Since a nuisance of this sort affects a "considerable number of persons" it is a *public* nuisance. (Civ. Code, § 3480.)

the condition or to protect the affected persons against it." (Rest.2d Torts, § 839.)

*People* v. *Southern Pac. Co.* (1957) 150 Cal.App.2d Supp. 831 [311 P.2d 200], provides an illustration of the common law of nuisance at work in a situation similar to that presented in the present case and demonstrates the interplay of that common law in both the civil and criminal law. In *Southern Pacific* the defendant was convicted of the misdemeanor violation of Health and Safety Code section 24242, which then prohibited the "discharge" of contaminants into the air. Although it was undisputed that the fire in question in that case was on property owned by the defendant, there was no competent evidence that the fire was started, or the contaminants "discharged," by employees or agents of the defendant. There was also no evidence, however, that the defendant made any effort to control the fire. (*Id.*, at p. 833.) After assaying various statutes (Civ. Code, § 3483 and Health & Saf. Code, § 13008) and case law (*City of Turlock* v. *Bristow* (1930) 103 Cal.App. 750 [284 P. 962]) that relate to *civil* liability for nuisance, the court affirmed the *criminal* conviction. In so doing, the court declared it to be the law "that the owner or person in control of real property who has notice or knowledge that a continuing condition exists on such property which violates the said smog law and who thereafter fails to use reasonable care to abate such condition, is liable therefor in the same manner as the one who first created it." (150 Cal.App.2d Supp. at p. 833.) In sum, the court utilized a common law definition of public nuisance[17] to construe a penal statute and justify the imposition of a criminal penalty.[18]

---

[17]The common law rule articulated in *Southern Pacific* (at p. 833) is essentially that set forth in section 839 of the Restatement Second of Torts, *supra*, previously discussed.

[18]One commentator has identified *Regina* v. *Stephens* (1866) L.R. 1 Q.B. 702, as the "conscious beginning" in England of the movement to do away with the requirement of mens rea and the adoption of the civil notion of strict liability in criminal nuisance cases. (Sayre, *Public Welfare Offenses* (1933) 33 Colum.L.Rev. 55, 59.) The court stated in that case, per Mellor, J., as follows: "It is quite true that this in point of form is a proceeding of a criminal nature; but in substance I think it is in the nature of a civil proceeding, and I can see no reason why a different rule should prevail," in a case of this nature, "between proceedings which are civil and proceedings which are criminal. I think there may be nuisances of such a character that the rule I am applying here would not be applicable to them; but here it is perfectly clear that the only reason for proceeding criminally is that the nuisance [rubbish from a quarry thrown into a previously navigable river by the defendant's workmen without his knowledge and against his orders], instead of being merely a nuisance affecting an individual, or one or two individuals, affects the public at large, and no private individual without receiving some special injury could have maintained an action. . . . The prosecutor cannot proceed by action, but must proceed by indictment; and if this were strictly a criminal proceeding, the prosecution would be met with the objection that there was no *mens rea,* that the indictment charged the defendant with a criminal offence when in reality there was no proof that the defendant knew of the act, or that he himself gave orders to his servants to do the particular acts he is charged with. . . . Inasmuch as the object of this indictment is not to punish the defendant, but really to prevent the nuisance from being

The fact that the defendant in *Southern Pacific* did not itself "discharge" the contaminant was given little weight because, as at common law, "[t]he owner or occupier of land, after notice or knowledge of a fire on his property, has the right to control it and thereupon becomes a person who discharges the smoke into the atmosphere; in other words, a duty to control the contaminant is by [Health & Saf. Code, § 24242] placed on such property owner or occupier." (*Id.*, at p. 834.) By the same reasoning, an owner of land such as Leslie, which independently knows or certainly should know if the existence of several hundred tons of detritus and other fill materials on its land, and which has in any event received notice thereof from BCDC, has the right to control such placement and may therefore be deemed a person who "undertakes" that unlawful act within the meaning of the McAteer-Petris Act. (§ 66638.)

The use of a theory of strict liability to impose criminal penalties for public nuisance offenses has been described in some cases as the "public welfare exception" to the mens rea requirement that normally applies in criminal prosecutions. For example, in *People* v. *Chevron Chemical Co.* (1983) 143 Cal.App.3d 50 [191 Cal.Rptr. 537], we recently held that a chemical company could be held criminally liable under Fish and Game Code section 5650 for discharging fertilizer process wastes and storm water runoff into a tributary of San Pablo Bay despite the absence of any evidence of wrongful intent or criminal negligence on its part. In reaching this result we stated as follows: "This principle, that strict liability is appropriate in regulatory offenses, has been followed in construing a variety of regulatory statutes: *Aantex Pest Control Co.* v. *Structural Pest Control Bd.* (1980) 108 Cal.App.3d 696 . . . (use of unlicensed poison); *People* v. *Travers* (1975) 52 Cal.App.3d 111 . . . (sale of improperly branded motor oil); *Brodsky* v. *Cal. State Bd. of Pharmacy* (1959) 173 Cal.App.2d 680 . . . (liability of pharmacist for compounding of prescriptions by unlicensed person). [¶] Justice Traynor, in [*People* v. *Vogel* (1956) 46 Cal.2d 798, 801, fn. 2 (299 P.2d 850)], enunciated the well recognized *public welfare offenses* exception to the mens rea requirement in criminal prosecution. These public welfare crimes are most often based upon the violation of statutes purely regulatory in nature and involving widespread injury to the public." (*People* v. *Chevron Chemical Co.*, *supra*, at pp. 53-54.)[19] Development of the public wel-

---

continued, I think that the evidence which would support a civil action would be sufficient to support an indictment." (*Regina* v. *Stephens*, *supra*, L.R. 1 Q.B. at pp. 708-710, quoted in Sayre, *Public Welfare Offenses*, *supra*, 33 Colum.L.Rev. at p. 59, fn. 16.)

[19]We recognize that in *Chevron* the company itself discharged the contaminants, whereas here an unknown third party actually performed the prohibited act. But this distinction does not affect the propriety of imposing strict liability insofar as the objection thereto is grounded on the absence of evidence of intent or affirmatively negligent conduct.

fare exception to the requirement of guilty intent corresponded with "the demands of an increasingly complex social order [which] required additional regulation of an administrative character unrelated to questions of personal guilt." (Sayre, *Public Welfare Offenses, supra,* 33 Colum.L.Rev. at p. 67.) "If violation threatens serious and widespread public injury, courts have no other course open to them. The orthodox fundamental principles of criminality must be sacrificed in such cases in the interests of enforcement." (*Id.,* at p. 79, fn. omitted.)

Thus, whether the context be civil or criminal, liability and the duty to take affirmative action flow not from the landowner's active responsibility for a condition of his land that causes widespread harm to others or his knowledge of or intent to cause such harm but rather, and quite simply, from his very possession and control of the land in question. (See *Sprecher* v. *Adamson Companies* (1981) 30 Cal.3d 358, 369-370 [178 Cal.Rptr. 783, 636 P.2d 1121].) This principle that the private right to control land carries with it certain strictly enforceable public responsibilities is, as we have seen, a venerable idea; and it is one that grows progressively more vital in the law as the interdependencies in our society become more apparent and the threats to the integrity of our environment more ominous.

Finding, as we have, that the subject provisions of the McAteer-Petris Act must be broadly construed and that the strict liability that results from such construction is entirely appropriate, we conclude that the cease and desist order in question was properly issued. Accordingly, the judgment is reversed.

Rouse, J., and Smith, J., concurred.

A petition for a rehearing was denied April 18, 1984, and respondent's petition for a hearing by the Supreme Court was denied May 24, 1984. Kaus, J., and Lucas, J., were of the opinion that the petition should be granted.