[No. A061758. First Dist., Div. Five. June 21, 1994.]

SAN MATEO COUNTY HARBOR DISTRICT, Plaintiff and Respondent,
v.
THE PEOPLE ex rel. SAN FRANCISCO BAY CONSERVATION AND
DEVELOPMENT COMMISSION, Defendant and Appellant.

COUNSEL

Daniel E. Lungren, Attorney General, Jan Stevens Assistant Attorney General, Dennis M. Eagan and Joseph C. Rusconi, Deputy Attorneys General, for Defendant and Appellant.

Kenneth M. Dickerson and Jean B. Savaree for Plaintiff and Respondent.

OPINION

**HANING, J.**—Defendant and appellant San Francisco Bay Conservation and Development Commission (BCDC) appeals a judgment enjoining it from initiating enforcement proceedings based on its contention that plaintiff and respondent San Mateo County Harbor District's (the District) policy concerning live-aboard vessels violates the McAteer-Petris Act (the Act) (Gov. Code, § 66600 et seq.; unless otherwise indicated, all further statutory references are to the Government Code), which created and defined BCDC's power and jurisdiction. BCDC's principal contention is that it has sole regulatory control over the berthing of such vessels in a harbor within San Francisco Bay.

FACTS

The parties stipulated to the following facts:

In 1977 the City of South San Francisco (the City) owned a small boat marina at Oyster Point, which lies both within the City's limits and the

District's territory. In October 1977 the City and the District jointly agreed to repair and/or replace the existing Oyster Point marina facilities and expand them pursuant to a 1975 proposed master plan agreement between the City and the State of California Department of Navigation and Ocean Development. The 1975 proposed master plan included leachate control measures, preparation of the project site for marina park landscaping and other auxiliary shoreside support facilities. The District and the City also agreed to permit the District to rehabilitate, manage, maintain and operate the existing Oyster Point marina and to construct, manage, maintain and operate a future marina to be developed at Oyster Point.

To accomplish these purposes the City and the District entered into a joint powers agreement, effective November 11, 1977, the purpose of which was to authorize and empower them to jointly develop and construct facilities at Oyster Point Marina/Park and to authorize and empower the District to manage, operate and maintain the existing and future Oyster Point Marina/Park. An Oyster Point Marina/Park Policy Board (the Board) was formed to accomplish the joint agreement consisting of two City council members and two District commissioners who together select a fifth member to represent the public. The Board is responsible for making recommendations to the City and the District on policy matters related to the construction, operation, management and maintenance of the marina/park.

Ultimate financial responsibility for the project rested with the District, as did supervision of the project's construction. The District assumed control over the existing operations at the marina. The project was to be constructed partially over lands owned by the City in fee, "and partially on tidelands and submerged lands[,]" the area at issue. The City had received the land encompassed by the tide and the submerged portion of Oyster Point marina, in trust, by statutory grants from the State of California in 1913 and 1925.

The area of Oyster Point where live-aboard boats are moored is physically within the area of BCDC's jurisdiction. In April 1997 prior to execution of the joint powers agreement the City obtained a permit from BCDC authorizing the expansion and improvement of Oyster Point marina as outlined in the agreement.

Since 1977 the District has operated, managed and maintained Oyster Point Marina/Park in accordance with the November 11, 1977, joint powers agreement, and undertaken construction of the project pursuant to the BCDC permit. Construction included rehabilitation of 278 berths in the west basin, 293 berths in the east basin and shoreline improvements, including public

access. The berth slips are included within the area statutorily granted to the City. The District allows these berths to be rented pursuant to the terms and conditions of the BCDC permit. Some berths are rented by boat owners who live aboard their vessels. A live-aboard rental requires lessees to demonstrate to the satisfaction of the harbormaster when applying for their rental, and every six months thereafter, that their vessel is navigable and fully operational in every respect; that the vessel be of a cruising type, kept in good repair and seaworthy condition; and that it leave the marina at least once every ninety days for a minimum of six hours, reporting departure and return times to the harbormaster.

Since 1976 10 marinas within BCDC jurisdiction have received permits which include specific authorization for berthing no more than 10 percent live-aboard vessels. As of December 31, 1992, 43 Oyster Point berth lessees used their berths, with District permission, for a live-aboard vessel. Since completion of the marina the number of live-aboards has fluctuated between 59 in 1989 and 23 in 1992. Oyster Point berths are not designated for any particular use and may be occupied by either live-aboard or recreational vessels.

All Oyster Point live-aboard vessels are navigable and seaworthy and leave the marina for at least six hours every ninety days. None of the live-aboard vessels is linked to shore by a sewage hookup. Most vessels use holding tanks. If a flushing head is used it is tested with dye in order to ensure that nothing is released into the bay. Sewage is pumped out at a pump facility at the fuel dock. A fresh water hookup is available for all vessels in the marina, using a garden hose, and many live-aboard vessels maintain a garden hose hookup in order to have fresh running water on board. Live-aboard vessel residents use onshore restroom facilities which are not open to the public. No houseboats dock at Oyster Point marina.

The BCDC permit neither specifically prohibits nor authorizes live-aboard vessels in Oyster Point berths. BCDC has demanded that the District seek and obtain an amendment to its permit prior to leasing any additional berths for live-aboard vessels at Oyster Point. It has also notified the District that the current live-aboard leases are not allowed under the permit, thereby placing the District in violation of the Act and subject to a cease and desist order and civil penalties of $20,000 per violation.

PROCEDURAL HISTORY

The District filed an action for declaratory and injunctive relief after BCDC (1) contended it had jurisdiction to regulate live-aboard vessels at the

Oyster Point marina, (2) demanded that the District obtain an amendment to its BCDC permit prior to issuing additional live-aboard berth leases, and (3) sought penalties because the District's current leases for live-aboard vessels were not provided for in the terms of the BCDC permit. The District sought a declaration that it, not BCDC, had sole authority to regulate live-aboard vessels within the Oyster Point marina, and a permanent injunction enjoining BCDC from taking action on its contention. BCDC asserted, as affirmative defenses, that the live-aboard vessels constituted "fill," as defined by the Act (§ 66632, subd. (a)), and that permitting live-aboard vessel berths constituted a change in the use authorized by the original BCDC permit, and therefore the District required permission from BCDC to allow such berths at Oyster Point. The trial court ruled that the live-aboard vessels in question did not constitute "fill," nor was there a substantial change in the use of the Oyster Point marina as envisioned by the original BCDC permit, and concluded that BCDC was without authority to regulate live-aboard vessels at Oyster Point.

## DISCUSSION

▪ The principal issue in this appeal is whether the District is required to obtain a permit from BCDC before allowing live-aboard vessels to berth at the Oyster Point marina. Insofar as the facts governing our review of this issue are undisputed, we decide the case as a matter of law. (*Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 611 [200 Cal.Rptr. 575].)

The Act recognizes San Francisco Bay as "the most valuable single natural resource of an entire region," and it is therefore in the public interest to have "a politically-responsible, democratic process by which the San Francisco Bay and its shoreline can be analyzed, planned, and regulated as a unit." (§ 66600.) The Legislature has declared that certain water-oriented land uses along the bay shoreline, including water-oriented recreation, but not housing, are essential to the public welfare of the bay area. (§ 66602.) To protect the body and shoreline of the bay it has empowered BCDC to issue or deny permits for any proposed project which involves making a substantial change in the use of any water within BCDC's jurisdiction. (§ 66604.) A "substantial change in use" (§ 66604) includes any "alteration, or other activity, whether or not involving a structure, if the activity . . . [¶] . . . [¶] involves a change in the general category of use of a structure[,] i.e., . . . residential, . . . recreational . . . ." (Cal. Code Regs., tit. 14, § 10125, subd. (b)(2).) If a governmental agency wants to make such a change, it must first secure a permit from BCDC, which shall grant the permit if it finds that

the project is consistent with the Act and the provisions of the San Francisco Bay Plan. (§ 66632, subds. (a) & (f); BCDC, San Francisco Bay Plan (Jan. 1969, as amended) [the Bay Plan].) The Bay Plan is the basic document establishing the policies to guide BCDC in administering its responsibilities under the Act. It was prepared, at the Legislature's behest, by BCDC and adopted by the Legislature, which declared it to be "a comprehensive and enforceable plan for the conservation of the water of the bay and the development of its shoreline[.]" (§§ 66603, 66651.)

The Bay Plan states that the "most important uses of the Bay are those providing substantial public benefits and treating the Bay as a body of water, not as real estate." (Bay Plan, Major Conclusions and Policies, § 2, p. 1.) The imperative of retaining the bay as a body of water is emphasized by the fact that past diking and fill has reduced the size of the bay by approximately one-third. (*Id.*, § 6, p. 2.) In the part entitled, "Recreation," the Bay Plan states that "[l]ive-aboard boats are designed and used for active navigation but are distinguished from other navigable boats in that they are also used as a primary place of residence. Although residential use is neither a water-oriented [nor] a public trust use, live-aboard boats can be converted easily to a navigable, recreational use and, when properly located within a recreational boat marina, can provide a degree of security to the marina." (Bay Plan, Recreation Findings, § e, p. 21.)

The Bay Plan's stated policy concerning live-aboard boats is that they "should be allowed only in marinas and only if: (1) The number would not exceed ten percent of the total authorized boat berths unless the applicant can demonstrate clearly that a greater number of live-aboard boats is necessary to provide security or other use incidental to the marina use; (2) The boats would promote and further the recreational boating use of the marina (for example, providing a degree of security), and are located within the marina consistent with such purpose; (3) The marina would provide, on land, sufficient and conveniently located restrooms, showers, garbage disposal facilities, and parking adequate to serve live-aboard boat occupants and guests; (4) The marina would provide and maintain an adequate number of vessel sewage pumpout facilities in locations that are convenient in location and time of operation to all boats in the marina, particularly live-aboard boats, and would provide the service free of charge or at a reasonable fee; and (5) There would be adequate tidal circulation in the marina to mix, dilute, and carry away any possible wastewater discharge. Live-aboard boats moored in a marina on July 1, 1985, but unauthorized by [BCDC] should be allowed to remain in the marina provided the tests of [(2)-(5)] above are met.

Where existing live-aboard boats in a marina exceed ten percent of the authorized berths, or a greater number is demonstrated to be clearly necessary to promote security or other use incidental to the marina use, no new live-aboard boats should be authorized until the number is reduced below that number and then only if the project is in conformance with tests [(1)-(5)] above." (Bay Plan, Recreation Policies, § 4c, pp. 21-22.)

When read together, the statutory scheme, Bay Plan and regulations make clear the need for uniformity; each marina cannot decide for itself whether a BCDC permit is required for its operations. Although BCDC does not forbid live-aboard boats at marinas, it requires the marina management to obtain BCDC's permission for such berths. The concern permeating all BCDC legislation is that the water of the bay be protected and preserved whenever possible for water-oriented uses. Housing is not generally considered a water-oriented use of the bay. (See generally, *Mein* v. *San Francisco Bay Conversation etc. Com.* (1990) 218 Cal.App.3d 727, 732-735 [267 Cal.Rptr. 252].) It is obvious that a boat, albeit navigable and seaworthy, whose principal function is not a mode of transportation but a year-round residence, can generate the kinds of adverse effects in the bay as would a house constructed on pilings over the bay. (*Id.*, at pp. 732-733.) The permit process enables BCDC to ascertain that a marina's arrangements for live-aboard boats comply with its policy regarding sanitation and density so that the bay is not jeopardized by the housing characteristics of vessels or other floating structures used as permanent residences. It also enables BCDC to fulfill its mandate of monitoring the bay as a single entity. To do so properly, BCDC must consider each use thereof in relation to every other use because, for example, excessive pollution or damage to the bay at any given area can directly affect all other areas.

The District's permit from BCDC to construct the Oyster Point marina allowed berths for 611 small boats without specifying that the berths, or any portion of them, were for live-aboard boats. If the District subsequently decided to use some berths for live-aboard boats, it first needed to secure a permit from BCDC—using the marina for residential purposes is substantially different from using it for recreational vessels. The fact that the number of live-aboard leases issued by the District and the sanitation requirements it imposes on its lessees may comply with BCDC policy does not relieve it from first obtaining a BCDC permit for such berths, any more than a property owner's word that his new house comports with all local building requirements relieves him of first obtaining a building permit.

Insofar as we conclude that allowing live-aboard boat berths constitutes a substantial change in the use of Oyster Point marina, we need not discuss

whether such boats constitute fill, as that word is defined in section 66632, subdivision (a).[1]

The judgment is reversed and the cause remanded with directions to vacate the injunction.

Peterson, P. J., and King, J., concurred.

---

[1]At oral argument the District contended it could utilize the entire marina for full-time, live-aboard boats, without obtaining BCDC's permission. We obviously disagree—the Bay Plan imposes a 10 percent limit on such use.