[Civ. No. 24216. Fourth Dist., Div. One. Jan. 8, 1982.]

SANTA ANA TUSTIN COMMUNITY HOSPITAL, Plaintiff and Respondent, v.
BOARD OF SUPERVISORS OF ORANGE COUNTY et al., Defendants and Appellants.

COUNSEL

Adrian Kuyper, County Counsel, and John W. Anderson, Deputy County Counsel, for Defendants and Appellants.

John A. McDermott II, McDermott & Trayner and Craig Cotora for Plaintiff and Respondent.

OPINION

**STANIFORTH, J.**—Santa Ana Tustin Community Hospital's (SATCH) petition for writ of mandate (Code Civ. Proc., § 1094.5) sought court review of certain actions (taken by the Board of Supervisors of Orange County (Board), the Orange County Health Officer, L. Rex Ehling (Health Officer), the Human Services Agency of Orange

County (Agency) and its director, Margaret C. Grier (Director)), which, it is charged, adjudicated and limited the right of SATCH to render emergency medical services under a license issued by the State of California. SATCH sought disclosure by the Board of several documents, the opportunity to review the material, the reopening of the "hearings" with an opportunity to present additional or rebuttal information and a requirement that the Board then indicate to SATCH whether the previous action taken by the Board would be altered on the basis of the additional or rebuttal information. A demurrer to the petition was overruled and an answer then filed. After evidentiary hearings, the trial court made findings of fact and issued its peremptory writ of mandate. The writ ordered the Board to (1) disclose certain evidence it utilized in determining SATCH's qualifications to be designated by the Board as a trauma center and thus be able to treat "trauma" patients in Orange County where SATCH is located, and (2) give SATCH an opportunity to rebut that evidence. Pending disclosure of the evidence and permitting opportunity for rebuttal, the court permitted the county's current trauma center designations to remain in effect.

FACTS

A paramedic program has been in existence in Orange County since 1973. In 1976 the Board (Res. No. 76-1466) approved the paramedic element of the emergency medical services of the county, which included an election to operate a pilot mobile intensive care paramedic program within the county as authorized by the Wedsworth-Townsend Act. (Health & Saf. Code, §§ 1480-1485.) The program included: paramedic units operated primarily by city and county fire departments; a county communication system operated by the Orange County Communication Department; base station hospitals, which gave directions to paramedics in the field; and emergency receiving centers in acute care general hospitals to which persons needing hospitalization were transported either by paramedic units or private ambulance.

In January 1979 the Board authorized a study to ascertain whether trauma victims were being properly cared for in Orange County. The study indicated a need for "trauma centers" strategically located throughout Orange County in order to reduce the number of deaths due to severe injuries. Lives could be saved if the victims of severe injuries were taken to hospitals where the emergency facilities included specially trained personnel and proper equipment to promptly meet the victim's medical needs.

Referral to "trauma centers" was indicated only where there were severe injuries involving more than one body system—no more than five percent of all trauma cases. Of this 5 percent, only the most severe and complicated were to be referred to a "tertiary referral trauma center."

This trauma center concept was a refinement of the then existing paramedic program operated by the Board. The new concept would divert certain defined trauma patients past the nearest receiving center to a trauma center which would be better able to meet the victims' medical needs.

In January 1980 the Director sent a letter to all Orange County hospitals requesting proposals from hospitals desiring to be designated as a trauma service hospital. Attached to the letter was the Board's approved criteria which a hospital would have to meet in order to receive the designation. The criteria could be met by every receiving center in the existing paramedic program. However, the Board intended to designate a limited number (five) in order to insure a viable system, both for economic and medical reasons.

Thirteen hospitals, including SATCH, responded with proposals. Ten hospitals were actually surveyed by a team of physicians, experts in the field of emergency medicine. The team members reviewed each application, visited each hospital, conducted in-depth interviews with hospital personnel, and reviewed the physical facilities of each hospital. The team members then completed an objective scoring document intended to measure the hospital's capabilities in various categories by assigning percentage scores to 82 separate elements. The written recommendation of the survey team included only a summary of the scores in four major categories having from three to five subcategories. Neither the hospitals nor the Board were given the individual scores on all 82 elements.

The survey team then recommended the designation of five trauma centers within four regions of Orange County, one each in the north, west and south regions and two in the central region, including SATCH. The survey team also recommended the designation of one "tertiary trauma center" with a countywide catchment area. This latter designation was proposed for the University of California, Irvine Medical Center (UCIMC) which was also to be a trauma receiving center in the central region. The survey team regarded UCIMC to be the only logical selection for a tertiary referral trauma center.

Before the survey team's recommendations were presented to the Board, three hearings were held at which the recommendations were considered and reviewed with an opportunity for interested parties to comment and ask questions. The first public hearing took place before the facilities subcommittee of the emergency medical care committee (an advisory group to Board). At the request of hospitals desiring to be designated as trauma centers, individual private meetings were held between each hospital and members of the survey team to discuss particular concerns a hospital might have with the recommendations. Later a public hearing was held before the emergency medical care committee.

Before adopting the recommendations of the survey team, and making the designations of trauma centers and a tertiary referral trauma center, the Board held a public hearing on May 7, 1980. Following the public hearing and upon the recommendation of the medical experts, the Board adopted Resolution No. 89-771 which provisionally designated SATCH as a trauma receiving center, UCIMC as a trauma receiving center and also a tertiary referral trauma center, and three other hospitals as trauma receiving centers, all to be effective June 7, 1980.

During each of the meetings at which the recommendations of the survey team were discussed—including the public hearing before the Board—SATCH demanded to see the team's objective scoring documents and to learn the scores which were given to SATCH and UCIMC on each of the 82 elements. SATCH also sought the proposal submitted by UCIMC and the summary prepared by staff of the Agency as to the proposals submitted by both SATCH and UCIMC. Neither SATCH nor any other hospital was afforded access to the requested material. Nor were these materials included in either oral or written presentations made to the Board in connection with its proceedings to designate trauma centers.

DISCUSSION

I

The Board contends its action in designating certain hospitals as trauma centers was a legislative act because (a) the Board was engaged in rulemaking, (b) it was in effect simply awarding a contract, which is a legislative act, and (c) no rights of SATCH were "ascer-

tained" or adjudicated. Therefore, it is contended since the trauma center designation proceedings were legislative and there was no specific statutory procedure to be followed in designating trauma centers, "due process of law is not an issue."

If in fact the Board was engaged in "legislative" action, then SATCH had no right to a "hearing" in the judicial sense. In discussing the right to a hearing before legislative action, the appeal court in *City of Santa Cruz v. Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 388-389 [142 Cal.Rptr. 873], stated: "Nor is there a constitutional right to *any* hearing. [Citations.] In such a proceeding 'due process of law' is not an issue. [Citations.] And the judicial 'function in passing upon the efficacy of the *means* employed by the [quasi-legislative] agency to effectuate the statutory purposes is ... a very limited one.' (*Ralphs Grocery Co. v. Reimel*, 69 Cal.2d 172, 179 ....)"

The distinction between legislative acts and judicial acts was expressed by the United States Supreme Court as follows: "A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power." (*Prentis v. Atlantic Coast Line Co.* (1908) 211 U.S. 210, 226 [53 L.Ed. 150, 158, 29 S.Ct. 67, 69.) Justice Holmes went on to state: "And it does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up." (*Id.*, 211 U.S. at p. 227 [53 L.Ed. at p. 159, 29 S.Ct. at pp. 69-70.) And the California Supreme Court in *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 909 [160 Cal.Rptr. 124, 603 P.2d 41], held: "There are several salient differences between quasi-legislative and quasi-judicial proceedings. 'In adopting rules governing service and in fixing rates, [the] commission exercises legislative functions delegated to it and does not, in so doing, adjudicate vested interests or render quasi-judicial decisions ....' (*Wood v. Public Utilities Commission* (1971) 4 Cal.3d 288, 292 ....)"

SATCH contends that the Board was "determining [SATCH's] qualifications to be designated ... as a trauma center *and thus be able*

*to treat 'trauma' patients in Orange County ....* " (Italics added.) This is not a correct assessment of the Board's function or the actions taken.

The statutory authority for the Board to designate certain hospitals as trauma centers is contained in the Wedsworth-Townsend Paramedic Act. That act authorizes a county to "contract with a general acute care hospital which has the approval of the county health officer to participate in the pilot program." (Health & Saf. Code, § 1480.) The Board in designating certain hospitals as trauma centers is engaged in the act of contracting with such hospitals pursuant to its statutory authority. The Wedsworth-Townsend Paramedic Act is the sole source of authority for a county to establish trauma centers. The Board has no legal authority to license hospitals with respect to the treatment of patients or to control in any manner the conditions under which a hospital may treat patients of any class or description. Such function rests entirely with the state Department of Health Services.

The purpose of the study made by the survey team of Orange County hospitals was to enable the Board to designate a total of five hospitals as trauma centers, one of which would be designated as the "tertiary" center. The purpose of the designations was to establish guidelines for persons and organizations involved in the Board's mobile intensive care paramedic program concerning the proper handling of a defined class of victims. The designations were intended to modify the existing mobile intensive care paramedic program—which required all victims be transported to the *nearest* appropriate receiving center in an acute care general hospital. The new transport protocol required victims of major trauma to be taken to the nearest appropriate *trauma* center even when that meant the victim might be transported past a nearer receiving center. This modification to the transport protocol of the mobile intensive care paramedic program could not be made without identifying those strategically located acute care general hospitals which had special equipment and staff and were willing to meet the needs of the trauma victim. The Board's action did not determine which hospitals had the legal right to treat patients of any class or description but only to identify for the benefit of paramedics and others involved in the mobile intensive care paramedic program those hospitals to which major trauma victims should be transported. The Board's aim was to provide victims of major trauma a better chance at life through more timely and effective treatment.

SATCH's theory was that the Board "adopted" the criteria for determining which hospitals would qualify for trauma center designations and then applied these criteria to the hospitals which sought the designation. Thus, in SATCH's view, the process was the application of a rule to a specific set of existing facts. This theory is not supported by the facts. Rather, the Board approved the criteria for use of the medical experts in arriving at their recommendations as to location, number and identity of proposed trauma centers.

The Supreme Court in *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 35, footnote 2 [112 Cal.Rptr. 805, 520 P.2d 29], held: "Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts." In substance, the Board's action here was the formulation of a rule with respect to the proper handling of a defined class of victims of trauma coming within its mobile intensive care paramedic program. It was not the application of any rule to a specific set of existing facts.

The Board's approval of criteria and establishment of a fact finding process for purposes of formulating a rule does not convert what is otherwise a legislative act into a quasi-judicial proceeding. (*Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271 [63 Cal.Rptr. 889].) As stated in *People* v. *Dean* (1898) 122 Cal. 421, 424 [55 P. 131]: "The mere fact that in certain proceedings pending before boards of supervisors notice must be given of a hearing, evidence of witnesses taken, and a decision made by the board involving a determination of facts based upon the exercise of judgment, does not constitute such proceeding even *quasi* judicial. These things constitute the mere form of judicial action. The essential elements of judicial action are lacking, namely, the ascertainment of existing rights."

Finally, the action of the Board has many of the attributes of a solicitation of bids for a contract. If this be a correct analogy, then the award of a contract, and all of the acts leading up to the award, are legislative in character. In *Quinchard* v. *Board of Trustees* (1896) 113 Cal. 664, 671 [45 P. 856], the court concluded "the invitation for proposals, the award of the contract—are all legislative in character."

SATCH's attempted analogy of the action of the Board to designate trauma centers to a license situation is inappropriate. The Board does

not have the legal authority to license hospitals. More particularly, it does not have the authority to restrict a hospital's ability to treat patients. The action of the Board did not purport to impose any such restrictions. It did not adopt any standards which would have to be met by any hospital which desired to treat trauma patients. The Board's action determined which hospitals were appropriately located, possessed adequate staff and physical facilities and had a desire to treat trauma patients coming within the Board's mobile intensive care paramedic program. Such action amounts to contracting with such hospitals as authorized by the Wedsworth-Townsend Paramedic Act. It was not a licensing of hospitals to treat patients of any kind or class.

## II

In view of our conclusion that the Board was engaged in a legislative or quasi-legislative function, its acts are not reviewable pursuant to Code of Civil Procedure section 1094.5, instead, the Board's action is reviewable under Code of Civil Procedure section 1085. (*City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 390 [142 Cal.Rptr. 873].) The scope of review of a legislative act is limited to an examination into whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support or whether it failed to follow the procedures and give the notice required by law. (*Strumsky* v. *San Diego County Employees Retirement Assn., supra,* at p. 34.)

The record here clearly shows the action was neither arbitrary nor capricious. The Board and the survey team made detailed investigation into which hospitals in Orange County would best provide treatment to victims of major trauma. The record before the trial court contains voluminous evidence there was a need for trauma centers and the hospitals selected were the appropriate hospitals to provide treatment to victims of major trauma. There is conflicting evidence as to whether UCIMC should have been designated as a tertiary referral trauma center. This court is not permitted to reweigh the evidence. We can only conclude, on this record, there was ample evidence to support the Board's action designating trauma centers and a tertiary referral trauma center. Substantial believable evidence belies any suggestion the action was either arbitrary or capricious.

This court concludes the procedures required by law were followed by the Board in designating trauma centers. (*Gong* v. *City of Freemont* (1967) 250 Cal.App.2d 568, 574 [58 Cal.Rptr. 664].)

## III

SATCH does not have a vested or protected right of interest which was "adjudicated" by the Board's actions. While SATCH may have a substantial vested property right in its hospital licenses, the Board did not in any way affect SATCH's property rights under the licenses by designating SATCH as a trauma center and by designating UCIMC as a tertiary referral trauma center. We repeat: The Board does not have the legal authority to take any action which would either deprive SATCH of any rights accruing from those licenses or to restrict in any way SATCH's ability to treat patients. Such authority is vested solely with the state Department of Health Services.

The possession of a license to operate a hospital does not guaranty that persons or agencies providing prehospital care to victims of trauma will deliver all or any particular number of victims to that hospital or that they have an obligation to direct victims to particular hospitals because of the hospitals' location or capabilities.

To the contrary, the Wedsworth-Townsend Paramedic Act specifically authorizes a county which is conducting a mobile intensive care paramedic program to contract with general acute care hospitals approved by the county health officer to participate in the program. It does not require the county to contract with all such hospitals or require the county health officer to approve all such hospitals. If the county chooses to contract with fewer than all acute care general hospitals, those not selected will not receive patients from the program. Due process of law must be afforded before depriving an individual of the ability to engage in a licensed business or profession (*Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162]),. yet no cases suggest the right to carry on the business or profession includes a right to a share of the available business. The Board was not required to provide additional procedural steps to SATCH in order to meet due process of law requirements.

Here the uncontradicted evidence was the trauma victims who would be included in the diversion to trauma centers amounted to only 5 percent of the total of all trauma victims. This 5 percent was estimated to be about 1,800 patients per year countywide. Of these 1,800 patients, only a very small number were expected to be involved in being directed to the tertiary referral trauma center, UCIMC. It was to be limited to the most complex cases of the severely injured persons.

The trial court rejected SATCH's claim that its licenses were affected by the Board's action, but concluded the Board's action had the "practical effect of virtually eliminating [SATCH's] opportunity to receive and treat complex trauma patients." The trial court's finding of fact is without support in the evidence.

### IV

In view of our foregoing determination of trial court error in the issuance of its writ, we do not examine the further contention of error in refusal to join UCIMC as an indispensible party.

The judgment is reversed with directions to deny the petition for writ of mandate.

Brown (Gerald), P. J., and Cologne, J., concurred.

A petition for a rehearing was denied January 22, 1982, and respondent's petition for a hearing by the Supreme Court was denied April 7, 1982. Newman, J., did not participate therein.