[No. A030097. First Dist., Div. Two. Mar. 26, 1987.]

MARTIN LANGSAM et al., Plaintiffs and Respondents, v.
CITY OF SAUSALITO et al., Defendants and Appellants.

872

COUNSEL

E. Clement Shute, Jr., Rachel B. Hooper and Schute, Mihaly & Weinberger for Defendants and Appellants.

Gary T. Ragghianti for Plaintiffs and Respondents.

OPINION

BENSON, J.—The City of Sausalito appeals from the judgment of the superior court granting the petition for a peremptory writ of mandate ordering

the city to issue a building permit to petitioners for the remodeling of the second floor of a building to create offices. We affirm the judgment.

Petitioners and respondents Martin Langsam and Donald K. Olsen (petitioners) are, respectively, the owner and the architect for the Marin Theatre Building located on Caledonia Street in the City of Sausalito. The building was constructed in 1914 and has been owned by the Langsam family for 70 years. Mr. Langsam is a lifetime resident of Marin County. He was raised in Sausalito and his principal business is there. The property had been in use for almost two decades when Sausalito enacted its first zoning ordinance in 1931. Since World War II a movie theatre has operated on the ground floor of the building while the upper floor has been used as a storage area.

On February 16, 1984, petitioners applied to the city for a building permit to convert 3,000 square feet of the second floor of the Marin Theatre Building to office space. No exterior alteration, structural alteration or expansion to the building was proposed. The building is located in a commercial-residential district of the city and the proposed use of office space is a permissible use as of right in the district.

The director of public works and the planning department staff determined no planning commission or city council review of the application was required by the Sausalito Municipal Code and that since no discretionary review was required, the proposed remodeling was exempt from the requirements of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.; Cal. Admin. Code, tit. 14, § 15300.1). In a written memorandum dated May 8, 1984, the city attorney also determined the project was exempt because no discretionary review was required.

In 1963, Sausalito adopted Zoning Ordinance No. 630 which required owners to provide off-street parking for the occupants of their buildings. The ordinance also contained a grandfathering provision that exempted existing buildings from the requirement to provide parking spaces. At the time of this enactment, the Marin Theatre Building was being used as a theatre on the ground floor and for storage on the second floor.

The permit to remodel the second floor was issued on May 14, 1984. It was "drawn" by petitioners on June 21, 1984. On June 25, 1984, several Sausalito citizens appealed the issuance of the permit to the planning commission of the city sitting as a board of adjustment. The director of public works thereupon issued a stop work order to petitioners. The board of adjustment voted to deny the permit. Petitioners appealed the board's

decision to the city council which denied petitioners' appeal by resolution dated October 16, 1984. On October 19, 1984, petitioners filed a petition for writ of mandate under both Code of Civil Procedure sections 1094.5[1] and 1085[2] seeking a peremptory writ ordering the city to issue them the requested permit. Petitioners ultimately abandoned its 1094.5 writ and proceeded under 1085. The trial Court granted the writ under Code of Civil Procedure section 1085 and this appeal by the city followed.

The city raises two arguments on appeal: (1) that the city council properly construed the city's offstreet parking ordinance to prevent conversion of the second floor of the building to office use unless offstreet parking were provided and (2) that the court erred in ruling the action was governed by section 1085 rather than section 1094.5.

■ Petitioners contend the city council's interpretation of the offstreet parking ordinance was lacking in legal foundation, arbitrary and without evidentiary support and that the applicable rules of statutory construction support petitioner's interpretation of the statute. Petitioners also assert the action was properly determined to be an action in traditional or ordinary mandamus under section 1085 because the city's duty to issue the permit was ministerial and the hearings before the city council were legislative or quasi-legislative in nature.

The city's 1963 zoning ordinance was in effect when the chief building inspector approved the petitioners' remodeling permit in May 1984. The

[1]Section 1094.5 provides inter alia: "(a) Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer, the case shall be heard by the court sitting without a jury. . . .

"(b) The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.

"(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

[2]Section 1085 of the Code of Civil Procedure provides: "It may be issued by any court, except a municipal or justice court, to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station; or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled, and from which he is unlawfully precluded by such inferior tribunal, corporation, board or person."

parties agree that two provisions contained in the 1963 ordinance, 10.210.2 and 10.210.1(i), are germane to the issues before us.

Section 10.210.2, the "grandfather clause," provides, inter alia: "(a) Nothing in this Title shall be construed as requiring the provision of additional parking spaces for any structure legally existing at the time of the effective date of this Title except as provided in subsection (i) of Section 10.210.1 hereof or as may be required in the authorization of any Conditional Use Permit or Variance.

"(b) No structure as it exists at the time of the effective date of this Title shall be deemed to be nonconforming solely by reason of the lack of off-street parking spaces, provided that any portion of the premises being used for off-street parking in connection with any such building shall not be reduced."

Section 10.210.1(i) provides: "CHANGE IN USE—ADDITIONS AND ENLARGEMENTS: Whenever on any parcel there is a change which creates an increase of more than ten (10) percent in the number of off-street parking spaces required by the tables in this Section, additional off-street parking spaces shall be provided as follows:

"The number of spaces required for the incremental change less the number of spaces, if any, in excess of the requirements of the tables in this Section before the change. Increases shall be computed by measuring:

"Residential Uses - Number of units or bedrooms

"All Other Uses - Floor area, occupancy limit or number of berths."

Table No. 7 accompanying Zoning Ordinance No. 630 sets forth the number of off-street parking spaces required for different uses. It requires one parking space for each 300 square feet of office space and one parking space for each four seats in a theatre.

In essence, the plain meaning and effect of the two provisions was to provide protection to grandfathered structures, such as the Marin Theatre Building, from the requirement of additional parking spaces. However if a subsequent change in the structure were to result in a use which would increase by 10 percent the number of offstreet parking spaces required, then such spaces would have to be provided before a permit would issue. Determination of an increase would be measured solely by resort to an accompanying table which was an integral part of the ordinance.

Petitioners here, prior to their application for the permit, had removed 90 seats from the theatre thereby, according to table No. 7, reducing the offstreet parking requirements for the structures use as a theatre by 22-1/2 spaces. The proposal for 3,000 square feet of second floor office space would, according to table No. 7, require 10 off-street parking spaces. Thus the proposed change to the structure did not create "an increase of more than ten (10) percent in the number of offstreet parking spaces required by the tables," but in fact resulted in a decrease. The city attorney and the planning staff accepted this offset when they approved the issuance of the permit.

At trial the city stated that "[a]s a general rule, [it] does not challenge the legality of meaningful parking offsets, where the proponent's increase of parking demand in his project area is matched by his simultaneous reduction of parking needs in that area." Here, the city argues that section 10.210.1(i) must be construed to require that any offset allowed by the ordinance should be an offset that would "truly reduce" the consequences of the increased demand generated by the proposed change in use. Stated another way, the city asserts that the ordinance must be construed to allow for consideration of parking offsets only if such offsets actually mitigate the consequences on the traffic and parking congestion expected to result from the proposed change in use. The city points to the fact that the theatre operates in the evenings and on weekends whereas the offices can be expected to generate parking needs during weekday business hours.

■ In effect, what the city asks us to do is to add a requirement which is not contained in the ordinance. This we cannot do. "In construing a statute the function of the judge is simply to ascertain what in terms or substance is already there and not to insert what has been omitted or omit what has been inserted. (Code Civ. Proc., § 1858.) Under the guise of construction the court will not rewrite a law [citation]; it will not supply an omission [citation]; and it will not give the words an effect different from the plain and direct import of the terms used. [Citation.]" (*Estate of Tkachuk* (1977) 73 Cal.App.3d 14, 18 [139 Cal.Rptr. 55].) ■ Where, as here, the ordinance clearly states that the offset is to be determined by reference to specific tables, we find no ambiguity "which is a prerequisite to any further judicial interpretation or clarification of its language. . . . The Code of Procedure section 1858 likewise admonishes and restrains judicial interpretation to this effect." (*Alpha Therapeutic Corp.* v. *County of Los Angeles* (1986) 179 Cal.App.3d 265, 271 [224 Cal.Rptr.498].)

The city cites *Leslie Salt Co.* v. *San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 614 [200 Cal.Rptr. 575], in support of its argument that the wording of the provisions must be interpreted broadly to

achieve the purpose for which the ordinance was enacted which is to relieve the traffic and parking problems in Sausalito. In *Leslie Salt,* the court was asked to interpret specific words of a statute so as to include not only persons who actually placed fill on the shorelines of San Francisco Bay without a permit but also the owner of property on which third persons had placed fill without a permit. The specific words to be construed were "has undertaken, or is threatening to undertake." Leslie contended the word "undertaken" could only be interpreted to refer to one who actually performed or threatened to perform the act of placing fill on land. The court, noting that words do not have "fixed, single and immutable meanings," found the words sufficiently flexible to include third persons who place fill on the land. The court adopted this meaning in order to further the purpose of the McAteer-Petris Act which was to regulate any proposed project which involved placing fill on the shoreline of San Francisco Bay.

The *Leslie Salt* holding has no application to the case before us. Here, the city points to no specific wording of section 10.210.1(i) which it believes must be broadly construed or interpreted. The plain unambiguous language of that section establishes a table as the required standard for determining whether a change in use of a structure subject to the grandfather clause will necessitate additional off-street parking. Table No. 7 contains no provision affecting offstreet parking requirements based upon time of use. It is not our function to rewrite the ordinance under the guise of statutory construction in order to add a condition that expresses an asserted legislative intent. Had the drafters intended such a result, they could readily have included language to accommodate their intent, as in fact they did in subsection (k) of the same section. There, a detailed formula (not applicable to the case at bar) is provided for the allocation of parking spaces depending on whether use is daytime or nighttime, weekday or weekend. The fact that time consider-ations are included in subsection (k) but omitted in table No. 7 of subsection (i) is compelling evidence of legislative intent that time of use was not a factor for consideration vis-à-vis a grandfathered structure.

 Thus in response to the city's first contention on appeal, we deter-mine that the city council's interpretation of the ordinance was in error.

 Looking next to the issue of whether the action was governed by sections 1085 or 1094.5 we conclude that the trial court was correct in applying ordinary or traditional mandamus to the proceeding under section 1085.

 Judicial review of a 1085 proceeding ". . . is limited to an examina-tion of the proceedings before the agency to determine whether its action

has been arbitrary or capricious, or entirely lacking in evidentiary support, or whether it has failed to follow the procedure and give the notices required by law. [Citations.]" (*Court House Plaza Co.* v. *City of Palo Alto* (1981) 117 Cal.App.3d 871, 880 [173 Cal.Rptr. 161]; *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83].) ■ The standard of review for an administrative mandamus proceeding under 1094.5 requires "a determination of whether the agency has proceeded without or in excess of jurisdiction, whether there was a fair trial, whether the findings of an agency were supported by substantial evidence in light of the entire record. [Citation.]" (*Court House Plaza Co.* v. *City of Palo Alto, supra,* 117 Cal.App.3d at p. 879.)

■ It is well established that the intent of the Legislature in enacting 1094.5 was to authorize ". . . judicial review only of the exercise by an administrative agency of an adjudicatory or quasi-judicial function." (*Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 278 [63 Cal.Rptr. 889]; citing *Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594, 598-601 [241 P.2d 283].) On the other hand, where an agency is exercising a quasi-legislative function, judicial review must proceed under ordinary or traditional mandamus. (*Wilson* v. *Hidden Valley Mun. Water Dist., supra,* at p. 278.)

The parties before us agree that the Sausalito Municipal Code requires a public hearing before a board of adjustment once a citizen appeals a decision of the public works director. It is also agreed that the municipal code requires a public hearing before the city council on appeal of a board of adjustment decision. The city takes the position that since a hearing was required by law, evidence was required to be taken and discretion in the determination of facts was vested in the board of adjustment and the city council, the proceeding is quasi-judicial in nature and the standard of review is under section 1094.5.

We disagree with the city's position. As our California Supreme Court has observed, ". . . the distinction between the quasi-legislative and quasi-judicial decision contemplates the function performed rather than the area of performance; . . ." (*Pitts* v. *Perluss, supra,* 58 Cal.2d at p. 834.) Putting the matter another way, the mere fact that an agency proceeding may contain certain characteristics of the judicial process does not convert the proceeding into a quasi-judicial function.

■ Here, though administrative appeal to the city council was provided by ordinance, the precise issue to be decided was not one permitting an exercise of discretion. The right to exercise discretion is by definition a necessary element in a proceeding under section 1094.5. The resolution of the issue

raised by petitioners did not call for the " 'exercise of judgment, and the careful balancing of conflicting interests, the hallmark of the adjudicative process.' " (Cf. *Pacifica Corp.* v. *City of Camarillo* (1983) 149 Cal.App.3d 168, 176 [196 Cal.Rptr. 670].) Quite to the contrary, where the evidence established that petitioners had complied with the unambiguous requirements of the ordinance and its accompanying table, the city council was compelled to perform a ministerial function, that is, to perform a duty which the law specifically enjoined and allow the permit to issue.

Even were we to focus our attention solely on the hearing conducted by the city council we would conclude that the action was governed by section 1085 for an analysis of that proceeding demonstrates that the council was functioning in a quasi-legislative capacity. *Wilson* v. *Hidden Valley Mun. Water Dist., supra,* 256 Cal.App.2d 271 is instructive. In *Wilson,* the water district denied, inter alia, the petitions of farmers who sought to exclude their lands from the water district. A hearing upon written protests relating to the exclusion proceedings was required by statute. The appellate court in *Wilson* found it unnecessary to determine whether the proceedings were formally sufficient for review by administrative mandamus since the water district was exercising its quasi-legislative powers in passing upon the petitions. In finding that the trial court's standard of review had to be made under ordinary mandamus (§ 1085) and not under administrative mandamus (§ 1094.5), the *Wilson* court commented: ". . . Fundamental to this conclusion is the proposition that legislative action encompasses more than law-making—because in acting upon these petitions, the board of directors [of the water district] plainly was not enacting legislation. But quasi-legislative bodies, like the Legislature itself, do far more than their primary function of law-making. . . . Hence the fact that in the subject proceedings the board was not enacting ordinances embodying rules and regulations does not make its actions any less quasi-legislative.

"Nor does the presence of certain elements usually characteristic of the judicial process mean that the board's action was quasi-judicial. In this case the board of directors of the District, in denying petitioners' requests for exclusion . . . , acted in response to specific petitions, with regard to specific parties and after hearing evidence. In these respects the decisions made by the board and the procedure used in arriving at its decision embodied characteristics of the judicial process.

"But these characteristics of the proceedings are not alien to the legislative process. Legislative bodies often act in response to specific petitions and with regard to specific parties. . . . Furthermore, the hearing process is not confined to the courts. The Legislature and administrators exercising

quasi-legislative powers commonly resort to the hearing procedure to uncover, at last [*sic*] in part, the facts necessary to arrive at a sound and fair legislative decision.... Hence the presence of certain characteristics common to the judicial process does not change the basically quasi-legislative nature of the subject proceedings." (*Id.* at pp. 278-279.)

In reaching its conclusion that the district's board of directors had functioned in a quasi-legislative manner the *Wilson* court observed that as the governing board of the district "... its dominant concern had to be the effect its actions would have not merely upon the interests of those owning or living upon the land immediately affected by the petitions, but also upon the interests of the people owning or living upon the land within the remainder of the District." (*Wilson* v. *Hidden Valley Mun. Water Dist., supra,* 256 Cal.App.2d at p. 280, fns. omitted.)

The *Wilson* court observed that this was not just a "private controversy" and that the petitions posed to the board "fundamentally political questions and the board's decisions in response therefore represented an exercise by it of essentially quasi-legislative powers." (*Wilson* v. *Hidden Valley Mun. Water Dist., supra,* 256 Cal.App.2d at p. 281, fn. omitted.)

The case before us, while factually distinguishable from *Wilson,* finds much similarity in principle. Here, the city council was confronted with an issue which impacted on two matters of general community concern, i.e., traffic congestion and office space. The council, as elected representatives, necessarily had concern for the interests of their constituents as a whole. Much of the discussion by members of the council and members of the public during the hearing centered on the policies that should be adopted to help solve the problem. A few remarks made by council members will serve to illustrate the political overtones which permeated the hearing:

"COUNCILMAN HUNTTING: Well, I think my position is quite clear in this community, that we have enough offices in Sausalito. Not only that, the City Council on this dais indicated the same feeling, with the exception of Councilman Taber. He wasn't here at the time. But we put forward to the Planning Commission a proposal that would eliminate any further office use in Sausalito and that was with full intent. That is an element of planning that is pending a decision at this time."

"COUNCILWOMAN SWEENEY: I asked Lee Jordan if we could come up with an emergency ordinance eliminating grandfathering and that might be a little difficult to do.

" . . . . . . . . . . . . . . . . . . . . .

"So we could be talking about 60 people, and I feel with the fact that these things that you have mentioned that are all showing the intent of our community to try to address the difficulty, even though we haven't brought it to a conclusion, we haven't yet eliminated the grandfathering."

"COUNCILMAN TABER: Yes. There is very little left for me to say, incidentally, but I would not try to address the legal issues at all because I have to take the advice of our city attorney and very frankly, I don't like what I hear. So what I am looking at is what I consider to be much more important. And that's the discomfort, the concern, the safety, the health, the welfare, of the citizens who live in the area. That seems to me to be more important than legal."

"COUNCILMAN HUNTTING: I believe those [bases of his motion] have been well stated by the supporters of my position. The safety, health and welfare are certainly issues that are supportive. Also, the fact that the Council has put forward its intentions with regard to office use in that area. I think everything is well founded for the Council's position."

We in no sense are critical of the council's genuine and legitimate concerns for the public interest. They are laudable. Were it a discretionary matter before them, their judgment would not have been disturbed by the lower court. However, where, as here, clear standards have been lawfully enacted, they must control and cannot be ignored. The hearing was a quasi-legislative function for, in essence, it sought to effectively amend an existing law through the guise of an adjudicatory process. As a quasi-legislative function, section 1085 governed.

The judgment of the trial court is affirmed. The matter is remanded to the trial court with instructions to issue the peremptory writ ordering the City of Sausalito to reissue to petitioners the permit for remodeling of the second floor of petitioners' building.

Smith, J., concurred.

KLINE, P. J., Concurring.—I write separately to emphasize why *Leslie Salt Co.* v. *San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605 [200 Cal.Rptr. 575], which is heavily relied upon by the city, does not apply to this case.

*Leslie Salt* stands for the proposition that a critical word or phrase will not be judicially assigned a meaning that would defeat the clear purpose of the statute in which it appears. The city seizes upon the case, and others upon which it relies, in the course of arguing that the lower court's interpretation of the offstreet parking ordinance involved in this case would frustrate that ordinance.

I quite agree that the furnishing of adequate offstreet parking—the purpose of the ordinance—will not be materially advanced by the trial court's reading of the measure, which we approve; for the removal of 90 seats from a theatre used primarily on weekends and evenings will not reduce parking needs generated on weekdays by the new offices. However, as much as my colleagues or I might like to fix this problem, *Leslie Salt* does not authorize us to do so.

The rules of statutory construction involved in *Leslie Salt* permit the courts to fill in such interstices in the law as may result from the uncertainty of language employed by the legislature in the drafting of a statute. Because the power of the courts to resolve such uncertainty is so potentially far-reaching, it must be exercised with restraint. As we pointed out in *Leslie Salt,* a measure of imprecision is almost always inherent in the use of words. But such imprecision does not invariably or even frequently create uncertainty about what is meant in the mind of an objective person.

There was a need for judicial interpretation in *Leslie Salt* because of the uncertainty of specific words appearing in the McAteer-Petris Act. As we explained, "[t]he meaning of the words of a statute or, to use the alternative approach favored by many courts, the intent of the Legislature, can only be determined with reference to the context in which the words are used; that is, with reference to such purpose as may be discerned from examining the entire enactment of which the words are part." (*Leslie Salt, supra,* 153 Cal.App.3d at p. 614, fn. omitted.) *Leslie Salt* thus recognizes that even a word of common usage which has an ordinary meaning may be ambiguous, if it is also amenable to another meaning, when adoption of the ordinary meaning would defeat the manifest intendment of the statute in which the word appears. (Accord, *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 260 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 802 [151 P.2d 505, 157 A.L.R. 324], cert. den. 324 U.S. 869 [89 L.Ed.1424, 65 S.Ct. 1013], reh. den. 325 U.S. 893 [89 L.Ed.2004, 65 S.Ct. 1183].) In other words, *Leslie Salt* says that ascertainment of the meaning of a disputed statutory provision must commence with an ascertainment of the purpose of the entire enactment.

The flaw in the city's attempt to apply the reasoning of *Leslie Salt* to this case lies in the fact that no provision of the offstreet parking ordinance is even arguably inimical to the purpose of the enactment. The city does not identify any assertedly ambiguous word or phrase in need of judicial clarification because it is not concerned about anything *in* the ordinance; what distresses the city is something that has been *omitted*: viz., a requirement that the proffered offset *contemporaneously* reduce the newly created need for offstreet parking. The city's real complaint, in other words, is not that the meaning of a word used in the ordinance is ambiguous in any respect, as was the case in *Leslie Salt,* but simply that, taken as a whole, the measure is not as effective as it can be made. This problem is not one for which there is a judicial remedy. Neither *Leslie Salt* nor any other rule of statutory interpretation authorizes judicial emendation of an unambiguous statute thought to be in need of "improvement." If there were such a rule, few laws would be beyond the reach of virtually unfettered judicial revision.