[No. B029793. Second Dist., Div. Two. May 24, 1989.]

JOINT COUNCIL OF INTERNS AND RESIDENTS, Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF LOS ANGELES COUNTY, Defendant and Respondent.

COUNSEL

Taylor, Roth, Bush & Geffner, Robert A. Bush, Ira L. Gottlieb and Hope J. Singer, for Plaintiff and Appellant.

DeWitt W. Clinton, County Counsel, and Steven J. Carnevale, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**COMPTON, J.**—The Joint Council of Interns and Residents (JCIR) sought a peremptory writ of mandate in superior court to compel the Board of Supervisors of the County of Los Angeles (Board) to rescind a contract with the University of Southern California (USC) for the employment of medical interns and residents at county health care facilities. That agreement essentially provided that the county would cease employing such personnel directly and that commencing July 1, 1987, USC would assume the obligation of hiring the physicians needed to staff the county's hospitals and public health facilities. As the bargaining representative for the interns and residents currently employed under the county's civil service system, the JCIR challenged the agreement as violative of county charter provisions which permit the Board to contract for personal services only after finding that "such work can more economically or feasibly be performed by independent contractors." The JCIR asserted that the agreement was not cost-effective and that the Board's contrary finding was not supported by the record.

After concluding that the Board had complied with the charter and its implementing ordinance in executing the contract, the trial court denied the writ petition. This appeal follows. ▮▮▮ The sole issue raised here is whether the Board's decision constituted a legislative or adjudicatory determination. The trial court concluded that the Board performed a legislative function in finding that USC could "more feasibly" staff the county's medical facilities and, accordingly, restricted its review to a determination of whether that decision was arbitrary or capricious. The JCIR maintains, however, that the Board's action was adjudicatory in nature and that the court should have undertaken an independent review of the record to determine whether the findings were supported by substantial evidence. For reasons which we shall discuss, we conclude that the trial court applied the correct standard of review in denying the writ.

The pertinent facts are not in dispute and may be briefly summarized as follows. Under the mandate of Welfare and Institutions Code section 17000, the county operates an indigent health care delivery system currently comprised of five medical centers, one general hospital, five comprehensive care centers, and forty-two community facilities. The Los Angeles County/University of Southern California Medical Center (Medical Center) is the primary medical facility maintained by the county under this system. For more than 60 years, that complex has served as the principal teaching hospital for the USC School of Medicine. Beginning in 1928, medical school faculty members, without cost to the county, began providing instruction to

interns and residents working with hospital patients, and participated actively in direct patient care. In 1952, however, USC advised the Board that the school could no longer afford to provide such assistance without payment from the county. As a result, the Board agreed to contract with the university as a provider of various patient-related services. Under the terms of the contracts negotiated by the county's chief administrative officer, both faculty members and students continued to provide patient care in exchange for the county's payment of an annual consideration to the university. USC further agreed to expend a specified sum annually for research projects conducted at county facilities and to contribute medical equipment for scientific and clinical use.

Although these contracts initially were challenged as violative of various county civil service regulations, they were upheld by the Court of Appeal in *County of Los Angeles* v. *Ford* (1953) 121 Cal.App.2d 407 [263 P.2d 638], and subsequently implemented. Similar agreements have been executed by the parties during the past three decades. Under the present system, faculty staff physicians are employed by and receive salaries from both USC and the county.[1] In that dual capacity, they render patient care, engage in scientific research, and generally supervise the training of medical students at county facilities. Faculty members may also maintain private practices and work at other medical institutions affiliated with USC. Although interns and residents are also directly employed by the county, their positions are classified as temporary, lasting from three to seven years depending upon the nature of their specialization. To maintain their employment with the county, however, all interns and residents are expected to be concurrently enrolled at USC in a postgraduate training program. Practicing under the supervision of faculty members, and as permitted by law, these physicians are responsible for providing the majority of patient care services at the Medical Center. That complex alone currently employs over 330 faculty staff physicians and approximately 900 interns and residents.

By 1975, the Board expressed some concern that the county's relationship with USC vis-à-vis the Medical Center and other health care facilities was not cost-effective. Although a task force convened for the purpose of studying the county's pay policies suggested a series of monitoring guidelines to assure accurate time allocation of physician services, changes in cost accounting practices were not forthcoming. In 1984, however, the Board requested the director of health services to recommend modifications in the operating agreement with USC that would enable the county to more pre-

---

[1] A portion of the salary paid by USC is subsidized by the county under the terms of the operating agreement to compensate the university for the staff's instruction of interns and residents at the Medical Center.

cisely account for services rendered by both faculty members and interns and residents. The plan ultimately proposed called for the county to contract with USC as the sole provider of all patient services and for the county to pay only for the cost of care actually received by patients at the Medical Center. Under this scheme, USC would initiate a billing system based upon the relative value of the services rendered by the physicians employed to staff the county facility. Each such service would be assigned a preset rate and the county would be charged accordingly. The proposal itself envisioned the execution of two separate contracts for the transfer of hiring responsibility from the county to USC on a phased-in basis. The first of these agreements provided that only newly retained interns and residents would be employees of USC, and that those currently holding such positions would remain in county employment until the completion of their training. The second contract established a similar framework for the hiring of faculty staff members.

In May 1987, the Board, after hearing conflicting views as to the cost-effectiveness of the plan, approved a resolution to contract with USC for the employment of interns and residents at the Medical Center commencing June 1, 1987. The JCIR, which had lobbied against the proposal from the outset, claimed that the agreement was invalid because it was not let pursuant to article IX, section 44.7 of the county charter. That provision, enacted by initiative measure as Proposition A in 1978, authorizes the county to contract for personal services which might otherwise be provided by civil service employees "when the Board of Supervisors finds that [the] work can more economically or feasibly be performed by independent contractors."[2]

Immediately following passage of the resolution, the JCIR filed its initial petition for writ of mandate in superior court, contending that the Board had failed to make the finding required by Proposition A.[3] The trial court

---

[2] Section 44.7 provides in full: "Nothing in this Article shall prevent the County, when the Board of Supervisors finds that work can more economically or feasibly be performed by independent contractors, from entering into contracts for the performance of such work. The Board of Supervisors shall adopt an ordinance specifying criteria for entering into contracts, and specifying competitive bidding procedures for the award of such contracts."

[3] The JCIR relied in part upon the provisions of section 2.104.380 of the Los Angeles County Code. That section states: "A. No contract may be awarded pursuant to Part 3 of this chapter unless all of the following requirements are met:

"1. The services provided under the contract will be performed more economically or more feasibly by an independent contractor;

"2. The county's ability to respond to emergencies will not be impaired;

"3. The award of the contract will not result in the unauthorized disclosure of confidential information;

"4. Alternative resources are available so that the services can be obtained from another source in the event of default by the contractor;

agreed and ordered the Board to reconsider the contract in light of the charter provision. Shortly thereafter, Robert C. Gates, the director of the department of health services, recommended to the Board that the agreement be approved as part of a "pilot program" to determine its "feasibility" or cost-effectiveness under section 2.104.385 of the Los Angeles County Code.[4] That ordinance provides as follows: "The Board may find that services may be performed more feasibly by an independent contractor than by county employees when a conclusive determination of cost effectiveness cannot be made prior to contract award but the contract will provide a pilot or demonstration program of reasonable duration to permit a comparison between the independent contract price for the services and the county's overall cost for performing or resuming the services."

At a subsequent hearing before the Board, both the county's chief administrative officer, Richard B. Dixon, and the director of the department of health services recommended approval of the contract as one phase of a four-year pilot program. Legal representatives of the JCIR also appeared at the hearing and adamantly opposed the approval of the contract, arguing that the plan was anything but cost-effective.[5] In support of its position, the JCIR relied in part on various staff reports which purportedly had concluded that the agreement actually would result in increased costs to the county. Both Dixon and Gates countered that at this juncture it was impossible to predict whether the contract would result in cost savings to the county.[6] After vigorous debate among the supervisors, the Board found that the "feasibility" requirements of Proposition A had been satisfied and ordered the plan implemented as of July 1, 1987.

The JCIR once again sought a writ of mandate, asserting that the county had failed to demonstrate any connection between the contracting out of

---

"5. The award of the contract will not infringe upon the proper role of the county in its relationship to its citizens; and

"6. The award of the contract, if financed in whole or in part by federal or state funds, will be in full compliance with all applicable federal and state regulations.

"B. In making a recommendation to the Board of Supervisors for the award of a contract, the department recommending the award shall state in writing that the requirements of this section have been met."

[4] In making his recommendation, the director assured the Board that the contract satisfied the requirements of section 2.104.380, subdivision A. (See fn. 3, ante.)

[5] The JCIR argued in part that the agreement would allow USC to charge back to the county the amount of social security tax (FICA)—approximately $1.1 million annually under current rates—it would be required to pay its employees under federal law. The county, of course, is not obligated to pay such taxes for its civil service employees. The JCIR further pointed out that the contract would entail additional administrative costs in excess of $250,000 annually that are not chargeable under the current system.

[6] Both Dixon and Gates asserted that any additional costs resulting from the contract would be offset by substantial savings generated by implementation of the new "relative value unit" billing system.

physician services to USC and the cost-saving requirements of Proposition A. In its petition, the JCIR also urged that the proceedings be governed by the administrative mandamus provisions of Code of Civil Procedure section 1094.5, requiring the trial court to determine whether the Board's decision was supported by substantial evidence. The court found, however, that the Board's action was quasi-legislative, rather than quasi-judicial in nature, and that there was no abuse of discretion in adopting the pilot program.

The JCIR maintains that the resolution of the instant appeal turns on the distinction drawn by the trial court between legislative and adjudicative actions. ■ If the Board's approval of the contract with USC is legislative or quasi-legislative, a reviewing court must proceed in ordinary mandamus (Code Civ. Proc., § 1085) and "is limited to an examination of the proceedings before the agency to determine whether its action has been arbitrary or capricious, or entirely lacking in evidentiary support, or whether it has failed to follow the procedure and give the notices required by law." (*Court House Plaza Co.* v. *City of Palo Alto* (1981) 117 Cal.App.3d 871, 880 [173 Cal.Rptr. 161]; see also *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29]; *Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 729 [135 Cal.Rptr. 588].) ■ If, on the other hand, the action is adjudicative, then the more rigorous standard of review compelled by Code of Civil Procedure section 1094.5 governs. That statute requires a determination of "whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's decision. . . ." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12]; see also *Langsam* v. *City of Sausalito* (1987) 190 Cal.App.3d 871, 879 [235 Cal.Rptr. 672].)

Although the rules of judicial review applicable to administrative actions are well-defined, the distinction between legislative and adjudicatory determinations is anything but clear. ■ The parties nonetheless agree that a legislative act generally predetermines what the rules shall be for the regulation of future cases falling under its provisions, while an adjudicatory act applies law to determine specific rights based upon specific facts ascertained from evidence adduced at a hearing. (See *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 613 [156 Cal.Rptr. 718, 596 P.2d 1134]; *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 211 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973]; *Wulzen* v. *Board of Supervisors* (1894) 101 Cal. 15, 24 [35 P. 353].) Said another way, legislative action is based upon "facts which help the tribunal determine the *content of law* and of policy and help the tribunal to exercise its judgment or discretion in determining what course of action to take" while adjudicative decisions generally

rest on "facts concerning the immediate parties—who did what, where, when, how, and with what motive or intent. . . ." (See 2 Davis, Administrative Law Treatise (1958) § 15.03, p. 353, quoted in *Dominey* v. *Department of Personnel Administration* (1988) 205 Cal.App.3d 729, 737 [252 Cal.Rptr. 620].) At bottom, "the distinction between the quasi-legislative and quasi-judicial decision contemplates the function performed rather than the area of performance; . . ." (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 834 [27 Cal.Rptr. 19, 377 P.2d 83].)

Arguing that "the application of established criteria to existing facts" is an essential element of the adjudicatory process (see *Pacifica Corp.* v. *City of Camarillo* (1983) 149 Cal.App.3d 168, 176 [196 Cal.Rptr. 670]), the JCIR urges us to conclude that the Board engaged in an "adjudicative function" when it "examined the rules and criteria of the ordinance, purported to marshal the facts relevant to the implementation of the subject contract, and finally, decided whether it met the requirements of the law." The argument, however, is based upon a misapprehension of the role of the Board in approving the contract and the faulty notion that legislative action is limited to "rulemaking."

We agree with the county that the Board's action possessed few, if any, of the attributes ordinarily associated with judicial decisionmaking. The Board neither engaged in fact-finding nor decided questions involving individual rights and liabilities. An adjudicative function implies an adversary proceeding between contending parties who are entitled to proffer evidence for review by an impartial trier of fact. (See *Wulzen* v. *Board of Supervisors, supra,* 101 Cal. 15, 24.) In approving the agreement with USC, the Board was not performing that kind of function. Its task, under the mandate of Proposition A, was to ascertain whether it would be cost-effective or "feasible" to transfer the responsibility for staffing county health facilities to USC. Its function was to receive and consider economic and social data, as well as opinion and argument, concerning the wisdom of making changes in the county's health care delivery system. Such decisions are not born out of statistics alone. They are fashioned by vigorous debate and the recognition of contending needs, benefits, and burdens. Even a cursory reading of the transcript of the hearing in this case makes it clear that the Board's determinations were judgmental as well as factual. Underlying the "economics" of the decision made here were value judgments concerning the privatization of governmental functions and the social cost of that process. Much of the discussion by Board members during the hearing centered on the policies involved in transferring to a private institution the authority to staff a public facility. Confronted with an issue which impacted the community as a whole, the Board's considerations are intrinsically legislative.

The decisionmaking process under review here involved much more than the mechanical application of statutory criteria to existing fact. Although Proposition A provided the standard for the Board's decision, the ultimate question of whether the contract should be executed was a political one shaped by discretion and public policy. It has long been established that "the award of a contract, and all of the acts leading up to the award, are legislative in character." (*Santa Ana Tustin Community Hospital* v. *Board of Supervisors* (1982) 127 Cal.App.3d 644, 652 [179 Cal.Rptr. 620]; see also *Quinchard* v. *Board of Trustees* (1896) 113 Cal. 664, 671 [45 P. 856].) This is so because the letting of contracts by a governmental entity necessarily requires an exercise of discretion guided by considerations of the public welfare. Legislative bodies are, of course, accustomed to making such decisions. As with the enactment of regulations which must conform to a statutory policy or directive, the approval of contracts in compliance with statutory authority is inherently legislative in character. Viewed in this context, we fail to see how the Board's application of a statutory standard in this case transformed the purely legislative act of awarding a contract into a quasi-judicial action. As observed in *Quinchard* v. *Board of Trustees, supra,* "The act does not cease to be legislative because the members of the city council are required to exercise their judgment in determining whether the improvement shall be made. The judgment which they exercise in ordering the improvement is not a determination of the rights of an individual under existing laws, but is the conclusion or opinion which they form in the exercise of the discretionary power that has been intrusted to them, and upon a consideration of the public welfare and demands for which they are to provide. . . . The fact that a public agent exercises judgment and discretion in the performance of his duties does not make his action or powers judicial in their character." (*Id.* at pp. 669-670.)

The decisions uniformly recognize that legislative action involves much more than lawmaking. "[T]he fact that in the subject proceedings the [agency] was not enacting ordinances embodying rules and regulations does not make its actions any less quasi-legislative. [¶] Nor does the presence of certain elements usually characteristic of the judicial process mean that [its] action was quasi-judicial. . . . [¶] . . . The Legislature and administrators exercising quasi-legislative powers commonly resort to the hearing procedure to uncover, at least in part, the facts necessary to arrive at a sound and fair legislative decision. . . . Hence the presence of certain characteristics common to the judicial process does not change the basically quasi-legislative nature of the subject proceedings." (*Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 279 [63 Cal.Rptr. 889].) Stated another way, the mere fact that a proceeding before a deliberative body may possess certain characteristics of the judicial process does

not convert legislative action into an adjudication of a private controversy. (*Anaheim Redevelopment Agency* v. *Dusek* (1987) 193 Cal.App.3d 249, 260 [239 Cal.Rptr. 319]; *Langsam* v. *City of Sausalito, supra,* 190 Cal.App.3d 871, 879.)

 While the Board in our case did conduct a hearing prior to its approval of the contract, the "ascertainment of facts as a basis for legislation does not render the process judicial or anything less than quasi legislative." (*City Council* v. *Superior Court* (1960) 179 Cal.App.2d 389, 393 [3 Cal.Rptr. 796]; see also *Heist* v. *County of Colusa* (1984) 163 Cal.App.3d 841, 846 [213 Cal.Rptr. 278].) Moreover, the fact that Proposition A required the Board to make a "finding" of cost-effectiveness or feasibility is of no import under the circumstances presented here. Although the statutory obligation to make a "finding" is a characteristic shared with adjudicatory proceedings, it does not stamp the function with an adjudicative character. (See *City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 389-391 [142 Cal.Rptr. 873].)

Finally, we note that the "hearing" held in this case was not mandated by statute. Review of actions by administrative mandamus is "limited to those instances in which a hearing is *required by law* before the administrative agency." (*Court House Plaza Co.* v. *City of Palo Alto, supra,* 117 Cal.App.3d 871, 879-880, italics in original; see also *Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 561 [216 Cal.Rptr. 367, 702 P.2d 525]; *Marina County Water Dist.* v. *State Water Resources Control Bd.* (1984) 163 Cal.App.3d 132, 138 [209 Cal.Rptr. 212].) Since neither the county charter nor the implementing ordinance require a hearing for the approval of contracts in accordance with Proposition A, administrative mandamus is not the proper remedy. In so concluding, we also note that the absence of such a requirement does not violate due process. There is no constitutional requirement for any hearing in a quasi-legislative proceeding. (*Franchise Tax Board* v. *Superior Court* (1950) 36 Cal.2d 538, 548-549 [225 P.2d 905]; *City of Santa Cruz* v. *Local Agency Formation Com., supra,* 76 Cal.App.3d at pp. 388-389.)

Having concluded that the Board was engaged in a legislative or quasi-legislative function when it considered and approved the county's contract with USC, we find that the trial court applied the correct standard of review in determining that the action was neither arbitrary nor capricious. (*Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28, 34.) The record presently before us makes it clear that the Board made a concerted effort to determine whether the task of staffing the county's medical facilities could be performed "more economically or more feasibly" by

an independent contractor, namely USC, than the county itself. In considering that issue, the Board had before it memoranda from the director of the department of health services, the chief administrative officer, the auditor-controller, oral testimony from those officials, oral testimony in opposition to the contract from the JCIR, as well as a report from an independent consultant. Although there is some evidence that the agreement would not be cost-effective, that view was anything but unanimous. Both the chief administrative officer and the director of health services, among others, opined that they could not now state whether the transfer of the hiring function to USC would result in cost savings to the county.[7]

Based upon this conflicting record, the Board reasonably found that the cost-effectiveness of the proposal could not be determined without first implementing a pilot program. This conclusion satisfied the "feasibility" requirement of Proposition A. This is not to say that this is the only conclusion which could have been reached under the facts presented here. This court, however, is not permitted to reweigh the evidence. (*Santa Ana Tustin Community Hospital* v. *Board of Supervisors, supra,* 127 Cal.App.3d 644, 653.) ■ Once exercised, legislative discretion is, absent special circumstances, not subject to judicial control and supervision. (*California Assn. of Professional Employees* v. *County of Los Angeles* (1977) 74 Cal.App.3d 38, 43 [141 Cal.Rptr. 290].) "Any decision made in the exercise of that

---

[7]During the course of the administrative hearing, the chief administrative officer testified in part as follows: ". . . Members of the Board, unfortunately, it is my view, and I believe the auditor concurs in it, that it is not possible for us to conclusively determine what our savings or our costs will be. However, I think it should be pointed out to the Board and made a part of the record that the contract before you in its determination clauses refers to a course of action your Board has essentially approved that it be a part of a totality of agreements. That totality of agreements has been estimated, however, I would not say that we can provide that number to you conclusively even if all agreements were before you that they would represent as much as $10 million a year net additional revenues to you. [¶] Some portion that we are unable to estimate, and that is the crux of the issue before you, is attributable to this agreement alone. It is generally conceded that large medical and third party payer hospitals such as ours, revenue is determined by the accuracy of their medical records and the way they operate their physician services. [¶] It is the asserted belief of the Director of Health Services with which our office agrees that under university leadership that provision will improve, and we will collect additional revenues through a different billing system, through better medical records. [¶] A $10 million estimate is no more or less than an estimate, and it is not possible for us to attribute how much of that is associated with intern and resident medical services and how much is associated with house faculty. *But it is quite clear that some portion is associated with each of the contemplated agreements including the one before you.* [¶] *Unfortunately, we cannot tell you precisely how much, or we would be recommending it not as a pilot, but as a long-term agreement.* It is our inability to give you conclusive documentation that causes us to ask you to establish it as a pilot, as we understand from counsel, is permitted under your ordinance as it now reads. *But it is quite clear that some portion of that estimated $10 million revenue is attributable to the improvements that this contract standing alone will provide you.*" (Italics added.)

[legislative] authority would involve the use of discretion. As a consequence, the steps to be undertaken, the method selected, and the decision reached in the course thereof, in the absence of fraudulent or arbitrary action, would not be interfered with by the courts." (*San Bernardino Fire & Police Protective League* v. *City of San Bernardino* (1962) 199 Cal.App.2d 401, 411 [18 Cal.Rptr. 757].) Under the circumstances, substantial evidence supports the finding that the Board's action was not arbitrary or capricious.

We lastly conclude that the Board fully complied with the procedural requirements of the implementing ordinance in approving the proposed agreement. Subdivision B of section 2.104.380 merely requires the department recommending the award of a contract to "state in writing that the requirements of this section have been met." (See fn. 3, *ante.*) That is precisely what occurred in this case. Contrary to the position advanced by the JCIR, nothing in the ordinance mandates that the recommendation include an analysis of the statutory requirements and their application to the contract under consideration. There was no error.

The judgment denying a writ of mandate is affirmed.

Roth, P. J., and Gates, J., concurred.